595 So.2d 598 (1992)
STATE of Louisiana, Through The DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
v.
CHAMBERS INVESTMENT COMPANY, INC.
No. 91-C-1202.
Supreme Court of Louisiana.
March 2, 1992.
*600 Ronald Joseph Bertrand, Bertrand & Soileau, Rayne, for applicant.
Harry Brenner Sadler, Provosty, Sadler & deLaunay, Alexandria, for respondent.
DENNIS, Justice.
The question presented is whether the claimant has a recognized property right in the development of its land for residential purposes and, if so, whether that right was taken or damaged by the State. The trial court awarded the claimant damages for past and anticipated delay in developing its land as a result of highway construction on the State's adjacent right of way. The court of appeal affirmed. 576 So.2d 1174 (La.App. 3d Cir.1991). We granted the State's application for writs of certiorari to review the award of damages for delay in development. 584 So.2d 1144 (La.1991). We reverse the court of appeal judgment and delete the award for delay damages from the trial court judgment. The claimant has a recognized and constitutionally protected property right to use and enjoy its land by developing it as a residential subdivision. However, Civil Code articles 667 and 668 impose limitations on a landowner's right of ownership, one of which is that he must tolerate some inconvenience from the lawful use of a neighbor's land. In the present case, the construction use of the State's neighboring tract did not exceed the inconvenience that the landowner was bound to tolerate.

FACTS
This litigation arises out of the construction of Interstate 49 between Alexandria and Lafayette. On April 24, 1986, the Louisiana Department of Transportation and Development expropriated 41.951 acres of land from the middle of a 300 acre tract south of Alexandria in Rapides Parish. The State deposited in the registry of the district court the sum of $758,881.00, representing the State's estimated compensation to the owner for the land taken and severance damages to the remainder. The owner, Chambers Investment Co., Inc., a closely held family corporation, answered the suit praying for additional compensation for the taking, additional severance damages and damages for past and future delay in developing the remainder.
At the time the 41.951 acre tract was expropriated, the entire 300 acre tract had been farmed by the Chambers family since the 1940's. The jury evidently determined that the highest and best use of the land before the taking was as an upper income residential development bounded on three sides by Bayou Robert. The highest and best use after the taking evidently was found to be as a lower income residential development, due to the tract being split in half by the interstate.
During the mid-1970's, the Chambers family explored the possibility of developing the tract as a residential development. However, the subdivision plats were abandoned at that time when the family learned that the land might lie in the proposed path of Interstate 49. New plats subdividing the 300 acre tract before the taking and the remainder afterwards were drawn after this expropriation proceeding was commenced by the State. The new plats were drawn at the request of Mr. Gene Cope, the Chambers' expert in real estate appraisal, for the purpose of determining the highest and best use of the land, and the resulting severance damages from the taking. Mr. Cope testified that it would take approximately five years to complete the construction of the interstate and that during that time it would be economically imprudent to develop the remainder property while construction *601 was underway. Because the property effectively would be removed from development during the construction period, Cope testified, Chambers would suffer a loss of profits in the sum of $548,680.00 from delay in development.
In addition to compensation for the land taken and severance damages, the jury awarded Chambers "other damages" of $510,671.00 for past and future delay in residential development during highway construction. The State appealed, assigning errors in the delay damage award, attorney fee award and interest commencement date. The Court of Appeal, Third Circuit, affirmed the trial court. In its application for writs of certiorari, the State sought review only of the award of damages for delay contending that such damage is non-compensable, or, in the alternative, that the evidence in this case is insufficient to support such an award.

PRINCIPLES AND HISTORY OF EMINENT DOMAIN
In its most basic aspect, eminent domain is the power of a government to compel its subjects to give up property interests in land or things. W. Stoebuck, Nontrespassory Takings in Eminent Domain 4 (1977). Since 1825 our Civil Code has declared that, it being the "first law of society" that the general interest shall be preferred to that of individuals, every individual who possesses under the protection of the laws, any property, is tacitly subjected to the obligation of yielding it to the community, wherever it becomes necessary for the general use. La.C.C. art. 2626 (1870), La.C.C. art. 2604 (1825). Eminent domain, therefore, always concerns property. That is, it always involves the taking or damaging of property interests by the state or some alter ego of the state, such as a public utility, that has been delegated the power to condemn. Stoebuck, supra, at 15; see also, La.Const. of 1974, Art. I, § 4; La.R.S. 48:441 (1977).
A problem arises because the word property was usedand continues to be used in two senses. In the United States, it is frequently used to denote indiscriminately either the objects of rights that have a pecuniary content or the rights that persons have with respect to things. Thus, lands, automobiles, and jewels are said to be property; and rights, such as ownership, servitudes, and leases, are likewise said to be property. This latent confusion between rights and their objects has its roots in texts of Roman law and is also encountered in other legal systems of the western world. A. Yiannopoulos, Property, 1 La.Civil Law Treatise § 1 (3d ed. 1991) [hereinafter "Yiannopoulos on Property"].
Moreover, in both the state and federal constitutions, the ambiguous word property is always used without further definition. Consequently, there was an early division of opinion as to whether the constitution used property to include the rights that persons have with respect to things as well as the objects of those rights. The early popular notion became "no taking without a touching." In 1823, in Callender v. Marsh, 18 Mass. (1 Pick.) 418 (1823), an influential decision, Massachusetts denied compensation for the blocking of an abutting owner's street access caused by the cutting down of the street. On the other hand, Chancellor Kent in 1816 in Gardner v. Trustees of Village of Newburgh, 2 Johns. Ch. 162 (N.Y.1816), recognized a nonphysical concept in allowing compensation to a riparian owner whose water level was lowered by municipal action. For over a hundred years some legal writers have opposed the physical notion of property. See, e.g., J. Bentham, 3 Bentham's Works 182 (1843 Ed.); see also, Stoebuck, supra, at 16, citing 1 J. Lewis, Eminent Domain 52, 55 (3d ed. 1909); T. Sedgwick, Statutory and Constitutional Law 524 (1857). Professor Yiannopoulos is in accord with this view: "Accurate analysis should reserve the use of the word property for the designation of rights that persons have with respect to things." Yiannopoulos on Property, supra. Although the physical concept still exerts a heavy influence in some opinions, the trend has been away from a touching requirement, with increasing acceptance of the possibility of takings without any physical invasion. *602 Stoebuck, supra, at 16-17; P. Nichols, Eminent Domain § 5.01[1] (3d ed. 1991).
As a matter of fact, it is now hornbook law that any substantial interference with the free use and enjoyment of property may constitute a taking of property within the meaning of federal and state constitutions. Nichols, supra, at §§ 6.01[1], 6.09 (3d ed. 1991). Accord Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); Adaman Mutual Water Co. v. United States, 278 F.2d 842 (9th Cir.1960), and cases cited therein. Thus, in most jurisdictions, property has come to be recognized, at least tacitly, as a nonphysical legal construct in eminent domain law. See, e.g., La.R.S. 48:441 (1977) (Recognizing both corporeal real estate and incorporeal servitudes as property). Whenever a court allows compensation for governmental interference with an abutting owner's street access, it is compensating for access as a property right separate from rights of possession. The same phenomenon occurs when compensation is given for state action that causes the owner a loss of riparian rights, an impairment of easements or servitudes the owner has on neighboring land, the violation of his restrictive covenant on nearby land, or loss of lateral support. The courts are not always explicit about it; but impliedly, if not expressly, they recognize street access, riparian rights, easements and servitudes, restrictive covenants, and lateral support as forms of property. See Stoebuck, supra, at 17.
There can be little doubt that one aim of Article I, § 4, of our state constitution in requiring that the owner shall be compensated for property "taken or damaged... to the full extent of his loss" was to assure that the State and its subdivisions compensate owners for any taking or damaging of their rights with respect to things as well as for any taking or damaging of the objects of those rights. The history of Section 4 reveals a desire to increase the level and scope of compensation beyond that provided by pre-existing state law. The change from the 1921 constitution's language ("just and adequate compensation") to the new phrase ("compensated to the full extent of his loss") was deliberate, prompted by a belief on the part of the sponsors that inadequate awards had been provided under the prior law. L. Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 15 (1974); cf., State, Dept. of Transp. & Dev. v. Dietrich, 555 So.2d 1355, 1358-59 (La.1990); State, Dept. of Highways v. Constant, 369 So.2d 699, 702 (La. 1979) (the purpose of the additional language in Article I, § 4 was to compensate an owner for any loss sustained by reason of the taking, and not merely restricted as under the former constitution to the market value of the property taken and to reduction in the market value of the remainder).
Further, our constitution requires compensation even though the State has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose. If there has been any taking or damaging, the expropriating entity is bound to make reparations according to Article I, § 4. Although the legislature has not provided a procedure whereby an owner can seek damages for an uncompensated taking or damaging, this court has recognized the action for inverse condemnation arises out of the self-executing nature of the constitutional command to pay just compensation. See Reymond v. State, Dept. of Highways, 255 La. 425, 231 So.2d 375, 383 (1970). The action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. Id. The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. La.Const. of 1974, Art. I, § 4; see also, Ursin v. New Orleans Aviation Board, 506 So.2d 947, 955 (La. App. 5th Cir.1987).
*603 Because the taking and damaging of legal property rights, as opposed to the concrete objects of rights, is by nature abstract and conceptual and often incompletely understood, there is an uncommon need for a firm framework of analysis. Accordingly, we have decided to adopt a three-pronged analysis, similar to that recommended by Professor Stoebuck, in determining whether a claimant is entitled to eminent domain compensation. Compare Stoebuck, supra, at 19. Under this analysis, we must first determine if a person's legal right with respect to a thing or an object has been affected. In other words, we must be able to identify a recognized species of private property right that has been affected, regardless of whether causes of action may exist on other theories; otherwise, it cannot be said there has been an exercise of the power of eminent domain. Second, if it is determined that property is involved, we must decide whether the property, either a right or a thing, has been taken or damaged, in a constitutional sense. If property is taken or damaged, one may say that there has been an attempted exercise of the eminent domain power. The final question then is whether the taking or damaging is for a public purpose under Article I, § 4. See Stoebuck, supra. In the present case, the parties have stipulated that the taking and damaging is for a public purpose; accordingly, we must assume that the requirements of this prong have been fulfilled.
We have not overlooked the fact that other jurisdictions would apply the "consequential damages" doctrine in analyzing problems of non-physical damage to property rights. A conscious choice to eschew the doctrine was made because it is ambiguous, confusing, and counter-productive to compensating the owner to the full extent of his loss. As Professor Nichols observed,
"The term `consequential damage' is ambiguous in character, and is not truly relevant to any discussion respecting the different classes of damage. In the proper sense of the term, all damages must of necessity be consequential, since all damage is the consequence of an injurious act. The use of the term introduces an equivocation which is detrimental to any hope of a clear settlement of the question. It means both damage which is so remote as not to be actionable, and damage which is actionable. Sometimes the term is used to denote damage which, [though] actionable, does not follow in point of time upon the doing of the act complained of." Nichols, supra, § 14.01.
Generally speaking, courts following "consequential damages" principles have drawn a distinction between severance damages, compensable in a condemnation proceeding, and damages to the remainder resulting from the intended use of the land taken. The latter generally have been declared not compensable as "consequential damages" with little or no explanation. See, e.g., United States v. 79.20 Acres of Land, More or Less, 710 F.2d 1352, 1356 (8th Cir.1983); Howard Johnson Co. v. Division of Admin., State of Florida, 450 So.2d 328 (Fla.App.1984); cf., M. Dakin & M. Klein, Eminent Domain in Louisiana 68 (1970 and Supp.1978); Nichols, supra, § 14.01[1], and cases cited therein. For this reason, the "consequential damages" approach tends to operate as a blanket rule barring landowners' recovery although in many cases property rights in fact have been taken or damaged without compensation.

THE CLAIMANT'S PROPERTY RIGHT
Initially, we must determine whether the claimant's interest that it contends was adversely affected constitutes property within the purview of eminent domain law. It is undisputed that the claimant is the owner of the land that it avowedly seeks to develop. Ownership is the right that confers on a person direct, immediate, and exclusive authority over a thing. The owner of a thing may use, enjoy, and dispose of it within the limits and under conditions established by law. La.C.C. art. 477 (1979). The State does not contend that there are any legal limits or conditions that would prevent the claimant from subdividing its land. Accordingly, *604 the claimant has a right of ownership to use and enjoy its land by developing it as it may choose, including residentially. Because this right is recognized by law as a right that the claimant has with respect to the land it is a property right that is protected by the constitutional provisions.
Next, in determining whether the claimant's right to develop its land was taken or damaged, it must be taken into consideration that Civil Code articles 667 and 668 impose legal limitations on a landholder's right of ownership in two important respects.
Art. 667. Limitations on use of property
Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
Art. 668. Inconvenience to neighbor
Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage.
First, although, in principle, a landowner may use and enjoy his property as he sees fit, Article 667 provides that he may not exercise his right in such a way as to cause damage to his neighbors. Second, although, in principle, the landowner may exclude any interference with his property, he is bound by Article 668 to tolerate certain inconveniences resulting from the lawful use of another neighbor's property. A. Yiannopoulos, Predial Servitudes, 4 La.Civil Law Treatise § 34 (1983) [hereinafter "Yiannopoulos on Servitudes"], citing La.C.C. art. 477 (1979 and Supp.1991); Critney v. Goodyear Tire & Rubber Co., 353 So.2d 341 (La.App. 1st Cir.1977); Balis, Civil Law Property 87 (3d ed. 1955) (in Greek), and other authorities.
Accordingly, in order to decide whether the State caused any damage to the claimant's right of ownership, we must determine whether the State's construction activities resulted in inconveniences that must be tolerated by the claimant under Article 668 or, rather, resulted in more serious inconveniences or interference that may be suppressed under Article 667. This is not always easy to determine. Broad language in certain court decisions might be taken to mean that there is no distinction between compensable and noncompensable damage, but the jurisprudence as a whole indicates that not all damage is recoverable under Article 667. In fact, as Professor Yiannopoulos has observed, "cases properly anchoring responsibility on this article either involve damage caused through fault or damage caused by constructions, by escaping dangerous substances, such as dammed water or sewage, and by ultrahazardous activities, such as dynamite blasting, spraying noxious chemicals, and pile driving operations by heavy equipment. No case has been found in which a landowner or other person was held liable under Article 667 for non-negligent acts and activities that were not ultrahazardous." Yiannopoulos on Servitudes, supra, § 50, at 139-40, citing extensive authorities. For all other non-negligent acts, works, and activities that cause damage or inconvenience to neighbors, Professor Yiannopoulos recommends that the concept of abuse of right of ownership should be used to establish the line of demarcation between acts that constitute a lawful exercise of ownership and those that are forbidden by Article 667. Id., citing D'Albora v. Tulane University, 274 So.2d 825, 832 (La. App. 4th Cir.1973); J. Cueto-Rua, Abuse of Rights, 35 La.L.Rev. 975 (1975), and other authorities. We are not prepared to say that, in all cases, a landowner must prove an abuse of right of ownership before he may suppress or recover for a violation of Article 667 by a neighbor. But we think *605 that in a case, such as the present one, in which there is no allegation or evidence of personal injury or physical damage to property, it is consistent with the principles of the Civil Code and our jurisprudence to require proof of the presence of some type of excessive or abusive conduct to hold a landowner responsible under Article 667.
Thus, the limitations established by Article 667 upon the State's use and enjoyment of its land, and the requirements imposed by Article 668 on the claimant to tolerate some inconvenience, also serve to mark the boundaries of each party's respective right to develop its land. Because the claimant's right to enjoy its property is not absolute but extends only as far as the law allows it, La.C.C. art. 667-669, unless the obligations and limitations of neighborhood are violated, the property rights of the claimant have not been violated. In other words, as long as the activities on the State's land do not exceed the level of causing the claimant "some inconvenience," there can be no taking or damaging of the claimant's property right.

APPLICATION TO PRESENT CASE
Applying these precepts to the evidence, we conclude that there has been no taking or damage with respect to the claimant's right to subdivide its land because the State's construction activities have caused the claimant nothing more than some inconvenience. The jury's determination in this regard is not entitled to any special deference because the trial court did not instruct the jury with respect to damage to the claimant's property right to develop the remainder. While the instructions were sufficient to apprise the jury of compensation for the taking and severance damages, they did not provide any guidance in determining whether the subsequent construction activity resulted in compensable damages in eminent domain. Without a correct instruction on the law, we cannot assume that the jury applied the pertinent legal principles to the case in finding that the right to develop the remainder had been damaged. Picou v. Ferrara, 483 So.2d 915 (La.1986).
The following evidence was presented at trial. Mr. Chambers, the president of Chambers Investment, testified that the construction project had been in progress for almost two and one-half years. During this time, the State's contractors used large pieces of equipment, including dump trucks, bull dozers, motor graders, etc., which caused noise and dust in the area. Mr. Chambers also testified that pile driving had occurred at the site. Mr. Chambers was of the opinion that it would not be economically feasible to develop the remainder while highway construction was going on.
Nonetheless, Mr. Chambers conceded that agricultural activities were successfully conducted on the remainder by a tenant farmer during this time. The tenant's only major problems had to do with the logistics of farming the severed remainder rather than the dust, noise, and construction activity. The only inconvenience actually described in any detail by Mr. Chambers in his testimony had to do with noise near his house on a different adjoining tract rather than with interference in the use of the remainder.
Mr. Cope, defendant's expert, was also of the opinion that the development of the remainder during construction was impracticable. Mr. Cope based his opinion that the construction would interfere with the claimant's ability to develop the property on the mere
"probability that it would be imprudent to attempt any form of development on... the remainder for a period of time during which the interstate highway itself was under construction.... [and] a very high level of noise activity during construction phases of this type of highway.... [and] a very ... uh ... high probability of dust and fumes and ... uh... construction equipment activity and things like that, which are just not conducive to the type of development that I envisioned."
However, Mr. Chambers and Mr. Cope failed to testify with any specificity as to the nature of the construction activity, exactly how it interfered or would interfere *606 with the development of the remainder, or the degree to which the State's construction activities on its land would occasion inconvenience to Chambers Investment. Mr. Darrell Willet, the State's expert, concurred in the opinion that an attempt to develop the remainder would likely be hampered or interfered with by the construction activity. But he too failed to give any testimony as to the level or intensity of the interference or inconvenience. In essence, the evidence consisted mainly of real estate appraisers' opinions and conclusions that residential development of the remainder would be economically unwise during the construction. The record does not contain any concrete evidence tending to show that damage to the claimant's right to develop resulted from ultrahazardous activities, abusive or excessive conduct, or acts causing physical property damage or personal injury. Consequently, we conclude that the construction activities on the State's land did not constitute a breach of the State's duty under Civil Code article 667 or amount to an inconvenience greater than that Chambers was bound to tolerate under Article 668. Therefore, Chambers Investment was not entitled to compensation for delay damages in this eminent domain proceeding because its constitutionally protected property right to the enjoyment and use of its land, including the right to develop it as a residential subdivision, was not taken or damaged.

CONCLUSION
For the reasons assigned, the judgment of the court of appeal is reversed and the judgment of the trial court is partially reversed by deleting the award for "delay damages" or "other damages" in the amount of $510,671; otherwise, the trial court judgment is affirmed.
COURT OF APPEAL JUDGMENT REVERSED. TRIAL COURT JUDGMENT PARTIALLY REVERSED.
COLE and LEMMON, JJ., concur.