743 So.2d 1263 (1999)
Harry R. LAYNE, Anthony P. Abraham, Lakefront North Properties, Inc. and Anthony P. Abraham, Inc.
v.
CITY OF MANDEVILLE, Adelaide J. Boettner, James J. Gleason, III, Emile Navarre, Edward J. Price, III, Kenneth V. Sollberger, Lynn R. Mitchell, Mertis A. Fulton, Lawrence J. Justrabo, John Paul Landry, Nils W. Lindbloom and Edward S. Ryan.
No. 98 CA 2271.
Court of Appeal of Louisiana, First Circuit.
November 5, 1999.
*1264 John W. Perry, Jr., Daniel J. Balhoff, Baton Rouge, Garic K. Barranger, Covington, for Plaintiff/Appellant, Harry R. Layne.
David Cressy, Metairie, Harry Rosenberg, New Orleans, for Defendant/Appellee, City of Mandeville.
Before: CARTER, C.J., LeBLANC, and PETTIGREW, JJ.
CARTER, C.J.
This appeal arises out of the dismissal of an inverse condemnation suit filed by the former owner of property that was rezoned by the City of Mandeville (the City) from light commercial to residential. The trial court dismissed the suit, finding that *1265 the former owner did not possess a property interest that required compensation under LSA-Const. art. 1, § 4.

BACKGROUND
Appellant, Harry Layne, was significantly indebted to First National Bank of St. Tammany (FNB). In December 1982, Larry Ott, a senior vice-president of FNB who handled Layne's debt portfolio, made a written proposal to Layne aimed at reducing some of Layne's debt to FNB. Specifically, Ott proposed that Layne execute acts of dation en paiement with respect to three of his properties. One of these properties was the Mandeville property (hereinafter the "Golden Shores" property), which is involved in this appeal. In exchange for executing the acts of dation en paiement, Layne would receive a credit against his debt in the amount of the appraised values of the Golden Shores and other two properties. Additionally, if any of the three properties that were the subjects of the acts of dation en paiement were subsequently sold for more than the appraised values, Layne would receive additional credits against his outstanding debt in the amount by which the sales prices exceeded the appraised values.
Layne and Ott subsequently reached an agreement, which was set forth in a letter sent by Ott to Layne on March 1, 1983. The letter explained how Layne's debt would be restructured and outlined the credits to which Layne was entitled as the result of the acts of dation en paiement that he was to execute that same day. Therefore, on March 1, Ott signed three separate acts of dation en paiement, one of which resulted in the transfer of ownership of the Golden Shores property to FNB in exchange for a $750,000.00 credit against Layne's total outstanding debt.
Also on March 1, Layne and FNB signed a document entitled "Agreement" (hereinafter the "side agreement"). This side agreement outlined the terms of the potential credit(s) that Layne would receive if the bank was able to sell the Golden Shores property for more than the appraised value. This side agreement also expressly allowed Layne to market the Golden Shores property for six months, but Layne was not entitled to any commission if his marketing efforts resulted in a sale of the Golden Shores property.
A few months later, Layne obtained a purchaser for the Golden Shores property, Anthony P. Abraham, Inc. (Abraham). Accordingly, a purchase agreement on the Golden Shores property was executed by Layne and Abraham on July 7, 1983. Abraham agreed to pay approximately $1,200,000.00 for the property and planned to construct at least 44 condominium apartments on the Golden Shores property. The purchase agreement was contingent on Abraham's ability to obtain various building permits from the City of Mandeville. FNB ratified the purchase agreement on September 22, 1983.

FACTS
On October 4, 1983, with Layne's assistance, Abraham applied to the City of Mandeville for a building permit to construct the condominium units. The request was met with opposition from several Mandeville residents who lived near the proposed development. On February 28, 1984, the Planning and Zoning Commission of the City of Mandeville held a public hearing regarding a proposal to rezone the Golden Shores property from B-2 (light commercial) to R-1 (residential), allowing only single family residences. Layne, individually and as president of a company he owned, Lakefront North Properties, Inc. (Lakefront North), was present at the meeting, as were several local residents. The Planning and Zoning Commission voted to recommend approval of the zoning ordinance to the City Council. In March 1984, the City Council voted in favor of the rezoning ordinance and the Golden Shores property was rezoned as R-1.
The sale to Abraham was never finalized, and on December 31, 1984, after the *1266 property had been rezoned as R-1, Lakefront North purchased the Golden Shores property and two other tracts of land from FNB for $1,000,010.00.

PROCEDURAL HISTORY
Layne, Lakefront North and Abraham[1] filed a petition for declaratory judgment and damages against the City and several of the individuals who were involved in the rezoning decision. The City filed a motion for summary judgment, based on the understanding that Layne was the owner of the Golden Shores property. The trial court granted the summary judgment and dismissed Layne's claims against the defendants. On appeal to this court, the grant of summary judgment was reversed because there were material issues of fact that precluded the trial court's grant of summary judgment. Layne v. City of Mandeville, 633 So.2d 608 (La.App. 1st Cir.1993), writ denied, 94-0268 (La.3/25/94), 635 So.2d 234.
On remand, Layne limited his claims to an inverse condemnation claim. While Layne's original petition alleged that he and/or Lakefront North owned the Golden Shores property, it was learned during discovery that Layne had transferred title of the Golden Shores property to FNB through an act of dation en paiement nearly one year before the rezoning. Lakefront North, did not acquire title to the Golden Shores property until December 1984, after the rezoning, with full knowledge that the property had been rezoned R-1.
The City filed a peremptory exception raising the objection of no right of action. In response, Layne admitted that neither he nor Lakefront North was owner of the Golden Shores property at the time of the rezoning. However, Layne alleged that the rights he received through the side agreement confected with FNB at the time the act of dation en paiement was executed were sufficient to allow his pursuit of a claim arising out of the alleged taking of the Golden Shores property.
On November 4, 1997, the trial court heard argument on the exception of no right of action. Witnesses testified for both Layne and the City regarding Layne's lack of ownership of the Golden Shores property at the time of the rezoning. The trial court also considered the documentary evidence introduced at the hearing, which included the act of dation en paiement of the Golden Shores property and the side agreement executed the same day. After taking the matter under advisement, the trial court rendered judgment in favor of the City, granting its peremptory exception raising the objection of no right of action.
In its reasons for judgment, the trial court concluded that Layne and Lakefront North did not have a sufficient interest in the subject matter of the alleged taking of the Golden Shores property. This was because neither Layne nor Lakefront had title to the property at the time of the rezoning. Moreover, over the objection by the City, the trial court considered the contents of the side agreement and concluded that the side agreement did not vest Layne with an interest that was sufficient to allow him to pursue a claim arising out of the rezoning of the Golden Shores property. Layne appealed the trial court's judgment.[2] In his brief, Layne asserts only that the trial court erred in granting the peremptory exception raising the objection of no right of action.

*1267 NO RIGHT OF ACTION
The objection of no right of action tests whether the plaintiff has a "real and actual interest" in the suit. Sivils v. Mitchell, 96-2528, p. 3 (La.App. 1st Cir. 11/7/97), 704 So.2d 25, 27. Stated another way, an exception of no right of action determines "whether the plaintiff belongs to the particular class to which the law grants a remedy for the particular harm alleged." Sivils, 704 So.2d at 27. The sole issue at trial of the exception is whether the plaintiff is in that group granted possible recovery by the law, not whether the plaintiff will or will not recover. Gustin v. Shows, 377 So.2d 1325, 1327-28 (La.App. 1st Cir.1979). The exception is appropriate when the plaintiff does not have an interest in the subject matter of the suit or legal capacity to proceed with a suit in a particular case.
Thus, the issue is whether Layne is within the class of persons which the law affords the remedy of compensation for an alleged taking by the City. To decide this, we must evaluate the nature of Layne's interest and determine whether it is an interest that constitutes property for inverse condemnation or expropriation purposes.

THE NATURE OF LAYNE'S INTEREST
Layne asserts that through the side agreement, he retained an interest in the value of the Golden Shores property to the extent it sold for more than the appraised value. Specifically, Layne had the right to have his residual debt reduced by the amount by which the sales price of the Golden Shores property exceeded the appraised value. Thus, Layne contends that this interest was a protected property interest that entitled him to maintain an action for inverse condemnation. We note that no Louisiana court has determined whether this particular kind of interest is sufficient to constitute a protected property interest for inverse condemnation and expropriation purposes. Nor have we found or been apprised of any cases from other jurisdictions that have addressed this particular issue. Accordingly, we must evaluate which interests our courts have found to be sufficient to constitute a protected property interest and which interests were not sufficient.

COMPENSABLE PROPERTY INTERESTS
The right to compensation is based on Article 1, Section 4 of the Louisiana Constitution of 1974, which states in pertinent part:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.... In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss....
Personal effects, other than contraband, shall never be taken.
This constitutional provision clearly gives a property owner the right to compensation for the taking by the government of his property.
One aim of Article 1, Section 4 of our state constitution in requiring that the owner shall be compensated for property "taken or damaged ... to the full extent of his loss" was to assure that the State and its subdivisions compensate owners for any taking or damaging of their rights with respect to things as well as for any taking or damaging of the objects of those rights. State, Department of Transportation and Development v. Chambers Investment Company, Inc., 595 So.2d 598, 602 (La. 1992). Moreover, the Louisiana Supreme *1268 Court has stated that "[t]he clear intent of the framers of this constitution was to expand the right to compensation to include not only the property owners, but also of other persons who have legal status to require compensation such as lessees." State, Department of Transportation and Development v. Jacob, 483 So.2d 592, 594 (La.1986). Thus, to be entitled to damages for inverse condemnation, a person dispossessed by the government need not be the owner of the land; however, he must have a compensable legal status running with the property. See Hodges v. LaSalle Parish Police Jury, 368 So.2d 1117, 1118 (La.App. 3rd Cir.1979).[3]
Courts have long recognized a lessee's, including a predial lessee's, status under law to require compensation for expropriation of lease property. Columbia Gulf Transmission Company v. Hoyt, 252 La. 921, 937, 215 So.2d 114, 120 (1968); State, Department of Transportation and Development v. Exxon Corporation, 430 So.2d 1191, 1193 (La.App. 1st Cir.), writs denied, 437 So.2d 1155, 1156 (La.1983) (citing State, Department of Highways v. LeBlanc, 319 So.2d 817 (La.App. 1st Cir. 1975)). Even the holder of an unrecorded leasehold interest has a right to bring an inverse condemnation action. Jacob, 483 So.2d at 595. Moreover, our supreme court has stated that "impliedly, if not expressly, [the courts] recognize street access, riparian rights, easements and servitudes, restrictive covenants, and lateral support as forms of property." Chambers Investment Company, 595 So.2d at 602. See State, Department of Highways v. Vermilion Development Company, 258 La. 1159, 1178, 249 So.2d 167, 174, cert. denied sub nom, 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 253 (1971) (subdivider with a contract to develop property owned by a third party has a sufficient property interest where property "taken" by government is adjacent to the third party's property); Arkansas Louisiana Gas Company v. Louisiana Department of Highways, 104 So.2d 204, 207 (La.App. 2nd Cir.1958) (right of way, whether an easement or servitude, is property).
However, a mere "user" and "possessor" of land may not bring a claim for inverse condemnation. See Hodges, 368 So.2d at 1118. Nor is the holder of an unrecorded option to purchase property entitled to intervene in an expropriation suit against the landowner, as if the owner of some right in the property. See Orleans Parish School Board v. Lupo, 470 So.2d 202 (La.App. 4th Cir.1985).
In the present case, Layne's interest is not a compensable legal interest that runs with the Golden Shores property. The source of his interest was the side agreement that affected only Layne and FNB. If the side agreement did not exist, the transfer of the Golden Shores property by Layne to FNB would have severed all ties Layne had with the Golden Shores property. Pursuant to the terms of the side agreement, Layne's ties to the Golden Shores property would terminate upon the sale of the property by or on behalf of FNB to a third party or Layne. Thus, Layne's interest in the property would not follow the property once FNB sold it.
Additionally, the interest Layne had with respect to the Golden Shores property was speculative. Layne would receive the benefit of an additional credit against his outstanding debt if, and only if, the Golden Shores property sold for more than the appraised value. Even if the Golden Shores property sold for more than the appraised value, FNB would receive all of *1269 the sales proceeds and then, PURSUANT TO THE TERMS OF THE SIDE AGREEMENT, would apply the excess sales proceeds as a credit against Layne's outstanding debt. Under these particular facts, we cannot find that Layne's interest in the Golden Shores property was one intended by the framers of our constitution to be a compensable property interest under Article 1, Section 4 of our constitution.
We also find Layne's reliance on Florida Rock Industries, Inc. v. United States, 18 F.3d 1560 (Fed.Cir.1994), cert. denied, 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), to support his assertion that he had a compensable property interest, misplaced. First, Florida Rock is a federal appellate court decision that is merely persuasive and is not binding authority. Second, the Florida Rock language cited by Layne as support for his contention is a description by the Florida Rock court of the different kinds of property interests. There was no clear indication that the court was describing different kinds of "compensable" property interests. The description is contained in a footnote to statements of dicta made by the Florida Rock court. Thus, we do not find the description persuasive to our resolution of this case. Third, the facts of Florida Rock are distinguishable from the facts of this case. Florida Rock involved a compensation claim by an owner of wetlands because the government denied the owner a permit to mine limestone under his wetlands. The present case does not involve a compensation claim made by an owner. Moreover, the issue in Florida Rock was whether the denial of the permit constituted a taking, not whether Florida Rock's interest was a compensable property interest for purposes of asserting an inverse condemnation action.
Finally, we note that Layne's property interest, the right to receive a credit against his outstanding debt in the amount of any excess sales proceeds upon the sale of the Golden Shores property, still existed after the Golden Shores property was rezoned. Also, Layne received consideration for the transfer of the Golden Shores property to FNBa $750,000.00 credit against his debt. Thus, any additional credit he may receive was lagniappe. FNB was the entity with a right of action to assert an inverse condemnation claim regarding the rezoning of the Golden Shores property. Notably, if FNB could not sell the Golden Shores property for more than the appraised value, FNB would suffer a loss because it did not have the right to negatively adjust the amount of the credit it previously granted to Layne upon the transfer of the property from Layne.

CONCLUSION
For these reasons, we do not find that Layne's interest rises to the level of a compensable property interest for inverse condemnation and expropriation purposes. The judgment of the trial court is affirmed. Costs of the appeal are assessed to Layne.
AFFIRMED.
NOTES
[1] Abraham voluntarily dismissed its claims in January 1991.
[2] Although the appellants' brief lists both Layne and Lakefront North as appellants, the only motion and order for appeal contained in the record was filed on behalf of Layne. Moreover, the brief fails to address the propriety of the dismissal of Lakefront North's claims. Thus, any appealable issues pertaining to Lakefront North are deemed abandoned. Uniform Rules-Courts of Appeal, Rule 2-12.4.
[3] In Hodges, the court stated the standard as a "compensable legal status running with the land." Layne argues that the use of the word "land" is too restrictive because Article 1, Section 4 of the Louisiana Constitution allows compensation for taking of "property," which includes things other than land. We agree that "property" can encompass more than "land"; however, we believe the third circuit utilized the term "land" in Hodges because the taking of land was at issue in the case. Thus, there must be a compensable legal status running with the property that is the target of the government's action.