900 So.2d 1121 (2005)
Julius B. SELLERS, Jr. and Pyramid E. Sellers
v.
ST. CHARLES PARISH.
No. 04-CA-1265.
Court of Appeal of Louisiana, Fifth Circuit.
April 26, 2005.
Rehearing Denied May 23, 2005.
*1122 Timothy S. Marcel, Luling, Louisiana, for Plaintiffs/Appellees.
Robert L. Raymond, Destrehan, Louisiana, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA, and WALTER J. ROTHSCHILD.
SOL GOTHARD, Judge.
Defendant St. Charles Parish (Parish), appeals an adverse judgment by the trial court that cast it in judgment to plaintiffs for damages. Plaintiffs, Julius and Pyramid Sellers, who own contiguous plots of undeveloped land in St. Charles Parish, filed this action against the Parish for damages arising out of unlawful entry and excavation on the property. After a trial on the merits, the trial court found in favor of plaintiffs and the Parish appeals.
The petition alleges that siblings, Julius and Pyramid Sellers (Sellers), own a portion of land in St. Charles Parish described as "Block M of Addendum Number One to Sellers Village and portion of Alice Plantation." This contiguous land measures approximately 425 feet by 2475 feet and encompasses several lots. In July of 2000 the Sellers sought to subdivide a portion of the plot to accommodate two buyers. The Sellers maintain that they received approval of the St. Charles Parish Planning and *1123 Zoning Department and the Zoning Commission on August 3, 2000. The Sellers assert that the St. Charles Parish Council blocked the subdivision by passing a resolution that conditioned the approval on the grant of a drainage servitude along the edge of one of the proposed lots.
The Sellers further allege that the St. Charles Parish Public Works Department, without notice to the landowners, illegally entered the property and widened a small ditch that served no public drainage purposes, causing destruction of timber, increasing the possibility of flooding on the property and rendering it useless for the purposes intended.
The Parish answered the petition and alleged the drainage ditch is part of the historical drainage plan of St. Charles Parish, and therefore, there was no illegal taking of plaintiffs' property.
After a trial on the merits, the trial court rendered judgment in favor of plaintiffs and cast the Parish in judgment for damages including, $46,370.00 to Julius Sellers, $46,110.00 to Pyramid Sellers, $13,625.00 in attorney fees and appraiser fees. The Parish filed a motion for new trial, which was denied by the trial court. This appeal followed.
At trial the court heard testimony from Pyramid Sellers on the issue of drainage. She stated that there was a hand-dug trough to accommodate a pooling of water caused by a pump that was formerly on the property, but has since been removed. She stated the ditch was originally dug around 1970, but no longer served any drainage purpose. Ms. Sellers further testified that there is a canal which runs east of Lots 1, 2, 3, 4, 5 and 6. The canal was built by Ms. Sellers' ancestors in title and empties into Lake Cataouatche.
Ms. Sellers further testified that she lives in New York and traveling to Louisiana so often because of this litigation has caused her to miss time at work. She also stated that getting on an airplane after 911 causes her trauma. Ms. Sellers left the negotiations of the sale to her brother, and she did not know the proposed sale price for the property.
Julius Sellers testified that his family has owned the property for generations. His father first subdivided some of the land in 1953 when the first phase of Sellers Village was developed. Mr. Sellers also testified that he has been involved with the land all of his life, and that he personally developed phase two of Sellers Village in 1973.
Mr. Sellers testified that Jan and Dondi Troxler approached him to purchase two lots, adjacent to Lots 5 and 9 in an addition to Sellers Village. Mr. Sellers owns the land adjacent to Lot 9 and his sister, Pyramid, owns the land adjacent to Lot 5. The sale price discussed was $60,000.00 each. The purchase agreement was verbal, there was nothing in writing. Mr. Sellers also stated that there was an understanding that he would sell the Troxlers additional contiguous lots in the future if they decided to expand their property. Mr. Sellers contacted his sister in New York and hired an engineer to draw the extension of the subdivision and create Lots 6 and 10A. The map drawn for the purposes of this subdivision contains the signatures of the Troxlers. An application for subdivision was submitted to the St. Charles Parish Planning and Zoning board for approval on July 10, 2000.
Mr. Sellers testified that he went onto the property on August 1, 2000 and found that the Parish had posted an official notice regarding a public hearing on the application for subdivision on Lot 9. The next day Mr. Sellers received a phone call informing him that the Parish was digging a canal through the property. Mr. Sellers *1124 arrived shortly afterward to find a crew from the Parish digging a "huge ditch" with a backhoe. Many of the trees had been removed, but upon Mr. Sellers' request the workmen agreed to leave one large tree remaining. The ditch ran from the front to the rear boundary line of Lot 6.
Mr. Sellers testified that he has not made a formal dedication of the strip in front of Lot 6 in favor of the Parish as a public road, nor has he granted a right of passage to the Parish. He did grant a right of passage to the Sprint Corporation for access to its tower, located further back on the land. Mr. Sellers confirmed that he did not grant permission to the Parish to enter his land nor has he granted a drainage servitude to the Parish.
Mr. Sellers immediately contacted Parish officials and the work was stopped. Later, Mr. Sellers received a call from Parish Councilman, Brian Fabre, who told Mr. Sellers to leave the ditch there. Mr. Fabre's request was presented to the Zonning and Planning Commission. Ultimately, on October 9, 2002, the St. Charles Parish Council passed a resolution approving the subdivision contingent on the granting of a drainage servitude at the edge of the lot.
Mr. Sellers' testimony regarding the origin and use of the swale that predated the ditch dug by the Parish corroborates that of his sister, although he supplied more details of the history of drainage in the area. Mr. Sellers testified that about ten years prior to the incident at issue herein, the Sellers constructed a ring levee around the back of the subdivision to protect the homes from flooding. A pump discharged water to the south, and the water flowed south with the slope of the property to the Sellers Canal. Ditches ran north and south to keep the water moving. There was a four-and-a-half foot servitude for drainage from the River Road all the way through the entire development on the eastern border. That servitude ran along the eastern edge of Lots 1 through 6 of Block M. The pump was near the boundary line of Lot 6. The swale that was enlarged by the Parish was not part of that system; it was dug to clear water that pooled up behind the levee.
The ring levee system was discontinued when the Parish put in a pumping station nearby to service the area. The Sellers donated their pump to the Parish and leveled off the levee to the south of the subdivision.
On August 2, 2000, the swale was concealed by a heavy growth of hackberry trees, most of which were removed by the Parish crew. Prior to that Mr. Sellers had rented a backhoe to clear some of the land and fill in the swale. He had completed about ninety percent of the work when the Parish entered the land and dug the ditch. Mr. Sellers stated that he did not wish to give the drainage servitude to the Parish, even if it was moved to the border of Lot 6, so he did not get the permit to subdivide. He explained that Mr. Troxler expressed his desire to purchase a contingent lot at a later date to expand his property and a servitude between Lot 6 and any future development precluded that plan.
Mr. Sellers testified that the Troxlers gave up the plan to buy the lots and the cost of extending the street and utilities to sell only one lot is cost prohibitive. He explained that land beyond the two proposed lots is leased to Sprint for twenty years and he would have to go about 500 feet further back to begin dividing the property into more lots.
Mr. Sellers testified that he has been inconvenienced and has suffered humiliation *1125 and embarrassment as a result of the actions of the Parish.
On cross-examination, Mr. Sellers was presented with testimony given at a prior disposition indicating the prices for the lots were $70,000.00 and $75,000.00. Mr. Sellers admitted he signed the drainage plan proposed in the application to the Zoning and Planning Board that stated, "drainage is provided through existing open swale ditches that drain into the existing drainage system. No drainage analysis is provided for this development." However, Mr. Sellers testified that the swale system referred to in that language is the one at the rear of the subdivision and not the one in question herein.
Mr. Wayne Sandoz, a real estate appraiser employed by the Sellers testified that he conducted an investigation to estimate a loss in value of the land. He stated that there are 14.3 acres of undeveloped land suitable for residential lot development which he valued at $12,000.00 per acre. Mr. Sandoz estimated the cost of development of the two lots as $19,488.00, which he added to the value of the area of land used to make the two lots, for a total development and land cost of $37,260.00. Mr. Sandoz subtracted that amount from the purchase price of $120,000.00 to conclude the loss of potential profit was $82,740.00.
Chris Tregre, the former president of the St. Charles Parish Council, testified that he was familiar with the Sellers Village Subdivision and the drainage system. He stated that the only east/west drainage servitude the Parish had in that area was along Pats Street and into the Sellers Canal. There was no servitude running east/ west on proposed Lot 6.
Jan Troxler testified that he told Julius Sellers that he and his brother Dondi wanted to build new houses in Ama. Mr. Sellers said he would try to sell them lots in the back of the subdivision. Mr. Troxler signed a waiver for the cell tower and applied to his bank for a home mortgage loan for the agreed sale price of $60,000.00. Mr. Troxler confirmed that there was no written purchase agreement. Mr. Troxler and his wife ultimately decided not to buy the lot because Dondi purchased a lot in Bayou Gauche.
Ritchie Friloux, whose home abuts Lot 6, testified that he knew the ditch across proposed Lot 6 was there at least since 1991 when he moved into his home. He has seen water flowing through the ditch from Bernard Avenue to the back of the subdivision. Mr. Friloux further stated that he asked his councilman, Mr. Fabre, to put culverts in any ditch they dug for drainage when the land was subdivided. Although the minutes of the public meeting about the approval of the subdivision to create Lots 6 and 10A reflect that Mr. Friloux attended, he did not recall attending; but, he did express his concerns about drainage and whether the ditch may be moved closer to his property.
Earl Matherne, the assistant director of the department of planning and zoning, was the coastal zone management administrator in 2000. He testified that he investigated the proposed subdivision presented to the Parish by the Sellers. It was a major subdivision because it involved some infrastructure improvements such as extension of a sewer line and a street. Because the plan was in violation of a subdivision regulation requiring a cul-de-sac, approval of the plan required a waiver from the Parish on that issue. Also, the waiver of a drainage analysis would have to be approved by the Parish Council. The Parish is not required to grant such waivers or pass a favorable resolution. Mr. Matherne recalled that there were drainage issues which developed concerning *1126 the project and were tabled and the project did not get past the Parish Council.
On cross-examination Mr. Matherne explained that there was a request for a waiver on the requirement of a drainage impact analysis that was not submitted with the Sellers' application. The planning committee recommended that both waivers to the cul-de-sac and the failure to submit a drainage impact analysis be granted. After the committee makes its recommendation, the matter goes to the planning and zoning commission. The commission members go out and physically inspect the area.
Palmer Cheramie, the Assistant Director of Public Works for St. Charles Parish, was the Assistant Superintendent of Drainage at the time of plaintiffs' application. Mr. Cheramie testified that he was familiar with the drainage conditions that exist in the Sellers Subdivision. Generally it drains north to south, from the river to the railroad track. There is an "equalizer" under Bernard Street that drains from east to west. Mr. Cheramie stated he knew about the ditch that crossed Lot 6, it took the overflow from Pat Street into the Sellers Canal.
Mr. Cheramie testified that he got a telephone call from his assistant regarding some dirt that had been put in the ditch. Mr. Cheramie discovered that Mr. Sellers was filling in the ditch with a backhoe. Because of an eminent rain event, Mr. Cheramie authorized his assistant to take the dirt out of the ditch. He issued a work order to that effect.
The court also heard testimony from Ellis Lemoine, an employee of the St. Charles Parish Waterworks Distribution Department. He testified that he was familiar with a project to clean out ditches in the Sellers Village Subdivision in August, 2000. He and his crew got to the property and offloaded the equipment and began cleaning out the ditches behind the lots. The men also went into the ditch on Lot 6 and cleaned it out. They denied making it any deeper or wider. Before they were finished, they were stopped.
At the end of trial, the court took the matter under advisement. Ultimately the trial court rendered judgment against the Parish as previously stated. In the judgment, the court adopted most of the facts and interpretation of law as suggested by the plaintiffs' post trial memorandum. However, from the written reasons for judgment it is clear the trial court did not find an inverse condemnation. We agree.
In the findings of fact, and analysis of law used by the trial court, it is acknowledged that our constitution recognizes a fundamental right to property in Article 1, Section 4. It is also acknowledged that a public body may legally acquire real rights in private immovable property by expropriation or appropriation.
In addition, our Supreme Court has recognized a claim of "inverse condemnation" and provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. State v. Chambers, 595 So.2d 598 (La.1992). In Chambers, the Supreme Court set forth a three-prong analysis for courts to use in determining whether a claimant is entitled to eminent domain compensation. The court must first determine if a recognized species of property right has been affected. If it is determined that property is involved, the court must decide whether the property has been taken or damaged in a constitutional sense; and then determine whether the taking or damaging is for a *1127 public purpose under Article I, § 4. Chambers, supra, 595 So.2d at 602.
In applying the above analysis, we find that the second prong has not been met. The property involved has not been taken or damaged in a constitutional sense. The testimony, which is undisputed, is that the property owners chose not to grant the Parish the servitude it required for approval of the subdivision. The Parish is clearly within its right as a public body to oversee zoning and to make the decisions necessary for the good of its citizenry.
The Parish did not demand the servitude be in the same location of the ditch so as to divide Lot 6. It required a servitude for drainage at the border of the lot instead. This was not acceptable to the land owner, and that is his choice. The only reason offered by the land owner for not granting the servitude was that he wanted to sell another contiguous lot to Mr. Troxler at some future date. We do not find that is sufficient to prove a taking in a constitutional sense. The Sellers can opt to divide the lots as proposed merely by granting a drainage servitude at the edge of Lot 6.
We do find, however, that the trial court was correct in finding the Parish trespassed on the land owned by Pyramid Sellers.
A trespass occurs when there is an unlawful physical invasion of the property or possession of another person. Additionally, in an action for trespass, it is incumbent upon the plaintiff to show damages based on the result or the consequences of an injury flowing from the act of trespass. The damages must be proved by a preponderance of the evidence, and this burden of proof may be met by either direct or circumstantial evidence. One who is wronged by a trespass may recover general damages suffered, including mental and physical pain, anguish, distress, and inconvenience.
(Citations omitted)

Griffin v. Abshire, 04-0037 (La.App. 3 Cir. 6/2/04), 878 So.2d 750 at 757, 758, writ denied 04-1663 (La.10/8/04), 883 So.2d 1018.
It is clear from the record that the Parish had no prior grant of a drainage servitude regarding the ditch, and that Ms. Sellers had not given permission to the Parish to enter her property. Further, we do not find sufficient proof in the record to show that any other type of servitude in favor of the Parish had been established. Therefore, we agree with the trial court's ruling that the act of digging out the existing ditch on Lot 6 was a trespass for which Pyramid Sellers can be compensated, and we find the award of $2,500.00 is within the trial court's discretion.
Conversely, we find error in the award of damages for trespass to Julius Sellers. There is no evidence to show the Parish workers entered Mr. Sellers' property at any time. All of the evidence contained in the record relates to the work done clearing the ditch on Lot 6 which is on land owned by Mr. Sellers' sister, Pyramid. Accordingly, we find the trial court erred in making this award.
We also find the trial court erred in awarding attorney fees in this case. La. R.S. 13:5111 provides for an award where there has been no "taking." In support of the award of attorney fees, the trial court relied on Williams v. City of Baton Rouge, 96-675, 96-676 (La.App 1 Cir. 4/30/98), 715 So.2d 15, reversed in part on other grounds, 98-2024 (La.4/13/99), 731 So.2d 240. We find that case distinguishable. In Williams, the public entity cut several large canals which did dissect the owner's property to the extent that it could no longer be used for residential purposes *1128 without building bridges for cars and pedestrians, causing the landowner much additional expense. In the matter before us, the landowners can still subdivide the same property, along the same proposed property lines, without any additional expense. They chose not to, and that is their right as property owners.
For the foregoing reasons we affirm the award for trespass to Pyramid Sellers, we reverse the judgment in all other respects.
AFFIRMED IN PART; REVERSED IN PART.