950 So.2d 55 (2007)
Rita H. Holzenthal Wife of/and Henry HOLZENTHAL, III, Gretel Holzenthal, Cecelia M. Holzenthal Wife of/and Henry W. Holzenthal, Patricia A. Stanley Wife of/and George E. Thomas, and Monica S. Espinel Wife of/and Luis F. Espinel
v.
SEWERAGE & WATER BOARD OF NEW ORLEANS.
Carlo R. Galan, M.D., Gwendolyn D. Redus, Billye B. Ber and Maxine Miller
v.
Sewerage & Water Board of New Orleans.
Jean Feran Wife of/and Fred Feran, Mary Susan Hunt, Mary Sharett Wife of/and Freddie Sharett, Penelope Sheffield, Elise A. Boyer and Cheryl L. Squire
v.
Sewerage & Water Board of New Orleans.
Nos. 2006-CA-0796, 2006-CA-0797, 2006-CA-0798.
Court of Appeal of Louisiana, Fourth Circuit.
January 10, 2007.
*59 Stephen B. Murray, Jr., Murray Law Firm, New Orleans, LA, Linda S. Harang, Law Offices of Linda S. Harang, L.L.C., Jefferson, LA, for Plaintiffs/Appellees.
James B. Irwin, David W. O'Quinn, Irwin Fritchie Urquhart & Moore LLC, New Orleans, LA, for Sewerage and Water Board of New Orleans.
Harry J. "Skip" Phillips, Jr., Margaret L. Tooke, Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, for Fidelity & Guaranty Insurance Company.
Betty F. Mullin, Herman C. Hoffmann, Jr., Simon Peragine Smith & Redfearn L.L.P., New Orleans, LA, for James Construction Group, L.L.C.
Terrence L. Brennan, Keith J. Bergeron, Deutsch, Kerrigan & Stiles, L.L.P., New Orleans, LA, for Schrenk & Peterson Consulting Engineers, Inc. and Security Insurance Company of Hartford.
Joseph G. Gallagher, Jr., Hulse & Wanek, New Orleans, LA, David J. Bourgeois, Duplass Zwain Bourgeois Morton Pfister & Weinstock, Metairie, LA, for Brown, Cunningham & Gannuch, Inc.
Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY and Judge MAX N. TOBIAS JR.
JOAN BERNARD ARMSTRONG, Chief Judge.
This case involves three groups of homeowners who claim that their homes were damaged during the course of construction of the Southeast Louisiana Urban Drainage Project ("Project"). The purpose of the Project was to increase substantially drainage capacity in portions of New Orleans. The Project included, among other works, the construction of a box culvert underground drainage canal located in the median of Napoleon Avenue in New Orleans. It is uncontested that the project was controlled by the United States Army Corps of Engineers (ACOE), which funded 75% of its cost. The New Orleans Sewerage and Water Board (SWB) was the local sponsor of the Project and funded the remaining 25% of its cost.
The plaintiff homeowners sued SWB, and SWB filed third party actions against Schrenk & Peterson Consulting Engineers, Inc. (S & P), its insurer, Security Insurance Company of Hartford (Security), Fidelity & Guaranty Insurance Company (Fidelity), insurer of SWB's engineering consultant, Brown, Cunningham and Ganuch, Inc. (Brown) and James Construction Group, L.L.C. (James). SWB claimed that S & P was contractually required to defend, indemnify and hold harmless SWB from claims arising from the Project to the extent that such claims were caused by S & P's negligent acts, errors or omissions in the performance of professional services pursuant to SWB's contract with S & P. SWB claimed that James' tortious conduct or violation of provisions *60 of its contract with ACOE caused the homeowners' damages. SWB claimed that Fidelity, as insurer of its consulting engineer, owed it a duty to defend the homeowners' suits and owed it coverage as an additional insured under Fidelity's policy with the engineering firm. The plaintiffs sued only SWB, and made no claims against the contractors or their insurers. SWB's claims against its own insurers were severed, and the remaining claims proceeded to a bench trial.
At the conclusion of the presentation of SWB's case, the trial court granted motions for involuntary dismissal made by S & P and its insurer, Security; by Fidelity and by James.
On March 10, 2005, the trial court granted judgment denying SWB's Motion for New Trial of the trial court's ruling granting a motion to dismiss at the close of SWB's evidence in favor of Brown and Continental Casualty Company.
On March 10, 2006, the trial court granted judgment denying SWB's Motion for New Trial of the trial court's ruling granting a motion to dismiss at the close of SWB's evidence in favor of S & P and Security.
On March 10, 2006, the trial court granted judgment denying SWB's Motion for New Trial of the trial court's ruling granting a motion to dismiss at the close of SWB's evidence in favor of James.
On March 10, 2006, the trial court granted judgment denying SWB's Motion for New Trial of the trial court's ruling granting a motion to dismiss at the close of SWB's evidence in favor of Fidelity. The trial court correctly noted in its reasons for judgment that the disposition of the foregoing third-party claims has no bearing on the grounds for liability asserted by the plaintiffs against SWB.
On July 20, 2005, the trial court rendered judgment in favor of the plaintiff homeowners as follows:
In favor of Rita and Henry Holzenthal, III and against SWB in the amounts of $379,805.06 for property damage; $15,825 for moving and storage costs, and $15,000 for emotional distress, plus court costs and interest from the date of judicial demand;
In favor of Carlo R. Galan, M.D. and against SWB in the amounts of $330,983.14 for property damage; $12,500 for moving and storage costs, $25,000 for emotional distress and $13,870 for personal property damage, plus court costs and interest from the date of judicial demand; and
In favor of Jean and Fred Feran and against SWB in the amounts of $246,936.10 for property damage, $18,650 for moving and storage expenses, $2,435 for out of pocket repair cost, $25,000 for emotional distress and $6,500 for damages to personal property, plus court costs and interest from the date of judicial demand.
SWB appeals from the foregoing judgments in favor of the plaintiffs and denying its motions for new trial of the trial court's directed verdicts on SWB's third party demands. For the reasons that follow, we affirm the aforementioned judgments.
The trial court adopted extensive findings of fact and reasons for judgment. In the mid- to late-1990s, SWB began to discuss plans for improving drainage in the Broadmoor neighborhood, where the plaintiffs' homes were located. The primary feature of this project would be installation of a large underground box culvert under the Napoleon Avenue median to be part of the larger ACOE/SWB Project to improve drainage in Southeast Louisiana.
On January 22, 1996, following a joint feasibility study by ACOE and SWB, those parties entered into a Project Cooperation Agreement for the construction of the box *61 culvert. SWB then entered into various service agreements with contractors to assist SWB in fulfilling its responsibilities under the agreement with ACOE.
The Napoleon Avenue project consisted of two phases: (1) work primarily at the "Y" intersection of Fontainebleu Drive, South Broad Street and Napoleon Avenue, and a short distance along the Avenue median to a point just north of South Dorgenois Street, and (2) work from the south end of Phase 1 along Napoleon Avenue's median to a point just north of South Claiborne Avenue. The Feran plaintiffs and Dr. Galan own and reside in homes fronting on Napoleon Avenue, and the Holzenthal plaintiffs lived within one block of the "Y" intersection at the north end of Napoleon Avenue.
Dewatering in connection with Phase 1 began in May, 2000 and continued until March, 2001. Phase 1 driving of steel sheet piles and timber piles began several months prior to dewatering. Phase 2 pile driving began in Spring of 2001 and Phase 2 dewatering began in July, 2001.
The plaintiffs claim that their homes were damaged as a result of the Napoleon Avenue drainage construction project, having suffered significant settlement and/or vibration damage as a result of the effects of dewatering, steel sheet pile driving, timber pile driving and movement of heavy equipment including cranes, pile driving hammers, excavation equipment, trucks, tractors and other heavy machinery. The sheet pile driving was accomplished using ordinary pile driving cranes and vibratory hammers to drive the steel sheet piles to a depth of between 25 and 30 feet below the surface, and then later using the same equipment to remove the steel sheet piles. The timber pile driving work was accomplished using ordinary pile driving equipment to drive timber piles to a depth of more than 35 feet below the bottom of the excavated site in order to support the poured concrete box culvert.
The trial court concluded that SWB is liable to each of the plaintiffs for the full costs of repair to their homes caused by the Project, together with the full cost of repair or replacement of their damaged personal property and reasonable damages for the emotional distress each suffered as a result of the Project.
The gravamen of the liability case is that the damages sustained by the plaintiffs were the necessary consequence of the Project, and that the Project was undertaken for a valid public purpose. An additional ground for liability is found in the ultrahazardous pile-driving activity that causally contributed to the plaintiffs' damages. The plaintiffs do not allege that any of the contractors on the Project deviated from accepted practice or from the Project's plans and specifications.
The trial court noted that underlying all of SWB's arguments with respect to liability is its repeated assertion, made likewise on appeal, that the Project is not SWB's project because the construction was directly supervised by entities other than SWB. It asserts it was merely a "local sponsor" of the Project and that it contracted away to third parties any responsibility it otherwise would have had for damages caused by the Project. The trial court rejected this basic argument, finding that as a matter of law, SWB could not and did not contract away the duties it owed the plaintiffs. The court also found, as a matter of fact, that SWB "showcased" the Project as an SWB project.
The trial court noted in its findings of fact that SWB claimed the Project as its own throughout its existence, at least until litigation against it commenced. Large signage along South Claiborne and Napoleon Avenues "boldly proclaimed that the *62 SELA project was a project of the Board." In smaller print, the signs explained that construction of the project would be supervised by ACOE. The court observed that the Project could not begin or proceed without SWB's approval, according to the testimony of SWB's General Superintendent, G. Joseph Sullivan. Exhibit JT-2, the Project Cooperation Agreement between SWB and ACOE, provides that SWB is vested with rights of comment and participation before and throughout the Project. Furthermore, the Project was connected to SWB's infrastructure and, at the conclusion of construction, existed as SWB property on SWB servitudes and easements.
Likewise, Exhibits JT-3, the SWB/ Brown contract, and JT-4, the SWB/S & P contract, provided that SWB would have the final right of approval over the contractors' activities. The trial court found that, based on the testimony of Mr. Sullivan, SWB monitored all design and construction activities throughout the Project, and SWB personnel from SWB's Network Engineering Department regularly participated in meetings with contractors and ACOE before and throughout the construction. The trial court also referred in its written reasons for judgment to Mr. Sullivan's correspondence to D.J. Webre, stating:
The Sewerage and Water Board will have input to the plans and specifications for drainage design and the Sewerage and Water Board will have representatives on site during construction to assist in making certain the contract plans and specifications are followed.
The trial court concluded that for purposes of considering the plaintiffs' claims for inverse condemnation and for strict liability under La.C.C. art. 667, "no one can credibly deny that the Napoleon Avenue covered canal project was, as the sign said, the `Sewerage and Water Board of New Orleans Napoleon Avenue Covered Canal.' We find that conclusion to be supported by the record."
SWB contends that the trial court judgment in favor of the plaintiffs erroneously imposed liability under a theory of inverse condemnation.
The Louisiana Constitution provided at the times relevant to this litigation:
Every person has the right to acquire, own, control, use, enjoy, protect and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. . . .
La. Const. Art. I, § 4; cited in Avenal v. State of Louisiana and Dept. of Natural Resources, 03-3521, pp. 25-26 (La.10/19/04), 886 So.2d 1085, 1103.
The Constitution requires compensation even in those cases in which the State has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose. State, Through Dept. of Transp. and Dev. v. Chambers Investment Company, Inc., 595 So.2d 598, 602 (La.1992). As the Louisiana Supreme Court noted in Chambers, it *63 is now hornbook law that any substantial interference with the free use and enjoyment of property may constitute a taking of property within the meaning of federal and state constitutions. Id.
The court held:
Although the legislature has not provided a procedure whereby an owner can seek damages for an uncompensated taking or damaging, this court has recognized the action for inverse condemnation arises out of the self-executing nature of the constitutional command to pay just compensation. The action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. Id. [Citations omitted.]
The Louisiana Supreme Court, in its Avenal opinion, applied the three-prong analysis set forth in Chambers, supra, 595 So.2d at 603 to determine whether a claimant is entitled to eminent domain compensation:
[T]he court must: (1) determine if a recognized species of property right has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for a public purpose under Article I, § 4. Id.; Constance v. State Through Dept. of Transp. and Development Office of Highways, 626 So.2d 1151, 1157 (La.1993) (using C.C. arts. 667 and 668, which impose legal limitations on a landholder's right of ownership, to consider whether property was taken or damaged under Art. I, § 4).
Avenal, supra at pp. 26-27, 886 So.2d at 1104.
In Avenal, the court held that the relevant consideration was whether the plaintiffs' property was "taken" for a public purpose or whether it was "damaged" for a public purpose. In that case, the distinction between a taking and a damaging was relevant because of differing prescriptive periods for actions arising out of those two causes of action. In the instant case, prescription is not an issue, so that the Avenal's critical distinction between "taking" and "damage" is not dispositive of these plaintiffs' claims. Whether plaintiffs' causes of action arose from a "taking of" or "damage to" their property, the suits on those causes of action were timely filed.
The trial court in its reasons for judgment specifically and correctly applied the Chambers three-prong test to the plaintiffs' claims.
SWB notes correctly that inverse condemnation is not a "catchall remedy" for tort damages sustained as a result of activities conducted by the sovereign. As noted in the third prong of the Chambers test, the state actor's activity must be in furtherance of a public purpose in order to satisfy the requirement for a finding of inverse condemnation. Our review of the jurisprudence relied upon by SWB does not support its conclusion that the Project was not a "public purpose" within the meaning of the Louisiana Constitution and jurisprudence.
In Angelle v. State of Louisiana, 212 La. 1069, 34 So.2d 321 (1948), a disinfection spraying program allegedly caused a fire that destroyed the plaintiff's property. The court noted

*64 [the] distinction between the destruction and damaging of private property by agents of the State while engaged merely in the performance of a governmental function and the deliberate taking or necessary damaging for the public use and benefit. In the first instance, the destruction or damage occurs not for a public purpose but by reason of the negligence of the state officer or agents. In the latter the property is taken or damaged under the power of eminent domain; it is an appropriation for public purposes for which adequate compensation is guaranteed to the owner. . . . 212 La. at 1077-78, 34 So.2d at 323-24.
The Angelle case might have been helpful to SWB had there been a preponderance of evidence of negligence on the part of the engineers or contractors. However, the trial court did not find negligence, and our independent review of the record in its entirety convinces us that this conclusion is supported by the record.
Likewise, Estate of Patout v. City of New Iberia, 98-0961 (La.7/7/99), 738 So.2d 544, does not support SWB's position under the facts of this case. In Patout, property owners adjacent to a public landfill were damaged when city employees trespassed on the owners' property to dispose of the city's waste. The court held that in order to qualify as a taking for public purposes, the damage need not be intentionally inflicted, but may be merely a necessary result of the public undertaking. The court noted that the damage to the owners in Patout was not a necessary result of the public undertaking, because it was not necessary for the employees to trespass on the owners' property. Had the landfill been operated properly, there would have been no trespass and, hence, no damage. The trial court's conclusion in the instant case that the contractors performed their work in accordance with the Project documents is supported by the evidence and distinguishes this case from Patout.
Similarly distinguishable from the case at bar are Summerville v. Missouri Pacific R.R. Co., 509 So.2d 639 (La.App. 3 Cir.1987) (damages were not the necessary consequence of public work that could have been accomplished without causing flooding to neighboring property owners); MCI Telecommunications Corp. v. Metric Constructors, Inc., 1989 WL 59926 (E.D.La. May 26, 1989) (severance of telecommunications lines by a state contractor laying cable could have been avoided by the exercise of reasonable care); Perkins v. Simon, 265 So.2d 804 (La.App. 3d Cir.1972) (city worker broke a fire hydrant causing the plaintiff's property to be flooded). The foregoing cases are distinguishable from the instant case, in that the plaintiffs herein do not rely on a claim of negligence. It is their position, accepted by the trier of fact, that the Project was performed in accordance with its plans and specifications, and the damage to the plaintiffs was caused as a necessary, albeit regrettable, consequence of the nature of the public work. Pile driving and dewatering, together with the concomitant use of heavy equipment, while serving a valid public purpose, had as their necessary consequence damage to neighboring property.
SWB cites Marie v. Police Jury of the Parish of Terrebonne, 161 So.2d 407 (La. App. 1st Cir.1964) in support of its position. However, in that case, the court found no allegation of condemnation in the plaintiff's petition:
Summed up, the two articles [in the petition] charge the police jury of the Parish of Terrebonne, acting through contractors or agents, employees and/or servants, had dredged the canal known as the Houma Deep Water Channel in such a manner that the water bottom *65 allegedly leased from the State Wild Life and Fisheries Commission by the plaintiff for the cultivation of oysters had been rendered useless because of the silt deposit and alteration of the natural tidal currents which affected the salinity of the water. Nowhere in the petition does the plaintiff charge an appropriation of the property so as to bring it within the exception to the principle that the sovereign cannot be sued without its consent. Plaintiff's suit is nothing more nor less than as found by the District Court and not one of a deliberate taking and unnecessary damaging of property for public use and benefit.
Counsel also misunderstands the basis of the case of Cousin v. Hornsby, supra, [87 So.2d 157 (La.App. 1st Cir.1956)] decided by this Court. The legal basis for recovery in this case as shown in the opinion in 87 So.2d on page 162, 163, is as follows:
"In our opinion this record shows no damages as a result of any act committed by the defendant and his subcontractor. Everything done was done in accordance with the contract except the act of going on the property prior to the actual expropriation thereof. No damages were committed outside the terms of the contract by this act. In other words, the plaintiff, with knowledge that the contractor was going upon his land to complete the drainage system in accordance with his contract with the Police Jury, did not choose to legally prevent such action and he is therefore relegated to only an action for the value of his land taken and damages to his adjacent property. This is exactly what he could have gotten and what the Police Jury would have had to pay him had he forced an expropriation suit, and it is exactly what he can get according to the authorities, once the improvement is placed on his property. We are not concerned with the question of removal for his suit is only one for damages. He would have had to yield the property had an expropriation suit been filed. See St. Julien v. Morgan's La. & T.R. Co., 35 La.Ann. 924; Gumbel v. New Orleans Terminal Co., 186 La. 882, 173 So. 518; Tate v. Town of Ville Platte, La.App., 44 So.2d 360 and Koerber v. City of New Orleans, La.App., 76 So.2d 466.
"In other words the Police Jury had the right to expropriate this property, the plaintiff had the right to resist, however, he waived this right and under the law the plaintiff can now only get that which he could have gotten had he forced an expropriation proceedings, viz., the value of the land taken and damages incidental to the taking; the nature of such damages is well fixed in expropriation suits * * *".
Far from representing any modern trend toward the abolishment of the "artificial" shield of immunity for State agencies, the above decision of this court fully recognizes the constitutional shield of immunity for State agencies and strictly follows the exception to that rule where property is taken "for public purposes" with the right of the owner to recover adequate compensation, and even though the owner took no prior action to prevent the placing of the improvements upon his property, he is nevertheless entitled to sue for the same damages he could have gotten had an expropriation suit been filed. Such is the law as set forth in the jurisprudence cited in the quote from the case, supra.
Miller v. Colonial Pipeline Co., 173 So.2d 840 (La.App. 3d Cir.1965), cited by *66 SWB, is particularly relevant. In that case, a pipeline company cut irrigation levees and negligently allowed plaintiff's cows to escape through a fence. The court made the distinction, applicable in the instant case, that the negligent damage to the cows did not constitute a taking, but the intentional cutting of the irrigation levees for a public purpose did.
We find that the record adequately supports the trial court's finding that the plaintiffs' claim has met the Chambers three-prong test: (1) plaintiffs' interest in their homes and personal property clearly is a recognized species of property right, and the reports of damage estimator A.C.M.S., Inc. as to the scope of work necessary to make the required repairs and the photographs submitted by plaintiffs showing the damage to their property demonstrates that those property rights have been "affected" adversely; (2) the damage was an integral consequence of the pile driving and dewatering work that was a necessary part of the Project; and (3) as to the public purpose in the instant case, it is manifestly evident that providing for improved drainage in an area that has often been referred to as the "bowl" of the city constitutes a valid public purpose.[1]
For the foregoing reasons, we conclude that the trial court's ruling that the plaintiffs suffered an inverse condemnation of their property is not manifestly erroneous.
SWB contends in the alternative that ACOE is the proper party against whom the plaintiffs should assert their constitutional claim of inverse condemnation.
SWB relies on this Court's opinions in Vuljan v. Board of Com'rs of Port of New Orleans, 170 So.2d 910 (La. App. 4th Cir.1965) and Petrovich v. State of Louisiana, 181 So.2d 811 (La.App. 4th Cir.1966) for the proposition that ACOE, and not SWB, is responsible for any "taking" under the circumstances of this case. A careful reading of these cases makes one thing abundantly clear, and that is that the issue of whether a particular entity has taken property within the meaning of the Constitution is to be decided on the facts of the individual case. There simply is no bright line by which it can be determined that an entity did or did not cause an inverse condemnation of property.
In Vuljan, the lessee of a water bottom sued the Port Commission alleging damage to his oyster beds caused by the Mississippi River Gulf Outlet. We held that the Commission had no liability for the damage to the oyster beds because the damage was brought about by construction of the Outlet authorized by Congress "over which the United States alone had and has exclusive jurisdiction and control." Vuljan, 170 So.2d at 911-12. This Court held that the test whether an action will lie under the Louisiana eminent domain provision or the Fifth Amendment to the United States Constitution depends entirely upon whether the public project is state or federal, and which government was acting under its power of eminent domain in carrying out the public project. The Court found that the Outlet is a federal project, noting:
The federal government alone constructed it after deciding where the project would be built, what spoil disposal areas it would need, their direction and width, and what land, navigation servitudes or easements were required. The State took nothing.
Vuljan, 170 So.2d at 912.
Louisiana's participation in the Outlet project was limited to its agreement to use *67 its inherent power of eminent domain to save the United States harmless against claims arising out of the Outlet's construction, maintenance and operation. This Court held that this hold harmless places the State "only in the position of agreeing to reimburse the United States the amount which an owner might by judicial determination first recover in damages in an action against the United States." There is no indication that the State of Louisiana had any participation in project design, monitoring, financing or otherwise.
The Project Cooperation Agreement between ACOE and SWB, executed by the Mayor of New Orleans in his capacity as President of SWB and certified by the SWB's Special Counsel, provides, inter alia:
II. A. 1. The Government shall afford the [SWB] the opportunity to review and comment on the solicitations for all contracts, including relevant plans and specifications, prior to the Government's issuance of such solicitations. The Government shall not issue the solicitation for the first construction contract until the [SWB] has confirmed in writing its willingness to proceed with the Project. To the extent possible, the Government shall afford the [SWB] the opportunity to review and comment on all contract modifications, including change orders, prior to the issuance to the contractor of a Notice to Proceed. In any instance where providing the [SWB] with notification of a contract modification or change order is not possible prior to issuance of the Notice to Proceed, the Government shall provide such notification in writing at the earliest date possible. To the extent possible, the Government also shall afford the [SWB] the opportunity to review and comment on all contract claims prior to resolution thereof. The Government shall consider in good faith the comments of the [SWB], but the contents of solicitations, award of contracts, execution of contract modifications, issuance of change orders, resolution of contract claims, and performance of all work on the Project (whether the work is performed under the contract or by Government personnel), shall be exclusively within the control of the Government. . . .
B. The [SWB] may request the Government to accomplish betterments. Such requests shall be in writing and shall describe the betterments requested to be accomplished. If the Government in its sole discretion elects to accomplish the requested benefits or any portion thereof, it shall so notify the [SWB] in a writing that sets forth any applicable terms and conditions, which must be consistent with this agreement. . . .
D. The [SWB] shall contribute a minimum of 25 percent, but not to exceed 50 percent, of total project costs in accordance with the provisions of this paragraph.
Article III of the Agreement, in parts A, B and C, provides for prior consultation by the Government with SWB to determine lands, easements and rights of way required for the Project, the improvements required on lands, easements and rights of way to enable proper disposal of dredged or excavated materials, and any relocations necessary for the Project.
Article V, part A provides for a Project Coordination Team, composed of representatives of the Government and the SWB, which "shall meet regularly until the end of the period of construction. The Government's Project Manager and a counterpart named by the [SWB] shall co-chair the Project Coordination Team."
*68 The Project Coordination Team's responsibilities are outlined in Article V, part C of the Agreement:
Until the end of the period of construction, the Project Coordination Team shall generally oversee the Project, including issues related to design; plans and specifications; scheduling; real property and relocation requirements; real property acquisition; contract awards and modifications; issues related to the creditable work; contract costs; the Government's cost projections; final inspection of the entire Project or functional portions of the Project; preparation of the proposed OMRR & R Manuals; anticipated requirements and needed capabilities for performance of operation; maintenance; repair, replacement, and rehabilitation of the Project; and other related matters. This oversight shall be consistent with a project management plan developed by the Government after consultation with the [SWB].
Article V, part D provides that the Project Coordination Team may make recommendations to the District Engineer, but that the Government has the discretion to accept, reject or modify the Team's recommendations.
Article IX provides that SWB shall hold and save the Government free from all damages arising from the construction, operation, maintenance, repair, replacement, and rehabilitation of the Project, except for damages due to the fault or negligence of the Government or its contractors.
The type of continuing input and consultation envisioned in the Agreement effectively distinguishes the facts of this case from those in Vuljan, supra.
In the Vuljan opinion, this Court recognized and distinguished two federal cases that found projects to be "state projects", Griggs v. Allegheny County, Pa., 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962) and Danziger v. U.S., 93 F.Supp. 70 (E.D.La. 1950). In both of those cases, as in the case at bar, at the completion of the project, the public improvement would be operated and maintained by the state agency. In the instant case, as in Danziger, title to the servitudes remained in the state agency and were not transferred to the United States.
Similarly, the West Jefferson Levee District sought the protection of the Vuljan holding in West Jefferson Levee District v. Coast Quality Construction Corp., 620 So.2d 319 (La.App. 5th Cir.1993), rev'd in part on other grounds, 93-1718 (La.5/23/94), 640 So.2d 1258. In that case, landowners filed reconventional demands in an expropriation suit, originally brought by the Levee District, for compensation, severance damages and delay damages connected to a levee project of the ACOE and Levee District. The Levee District resisted the property owners' claims, contending that the federal court of claims was the proper jurisdiction, having exclusive jurisdiction in cases involving losses caused by federal takings. In that case, the court rejected the notion that because of ACOE's involvement, it was an indispensable party, and the court of claims had sole jurisdiction, finding that the Levee District was, in fact, the "taker" of the property when it filed for expropriation in 1989.
SWB also relies on this Court's opinion in the Petrovich case. In that case, as in Vuljan, the damages allegedly suffered "were as a result of the construction of the Barataria Bay Waterway, over which the United States had exclusive jurisdiction and control." This exclusivity of jurisdiction and control is absent in the instant case.
*69 For the foregoing reasons, we conclude that the trial court's holding that SWB was the proper party to be held responsible for the taking is not manifestly erroneous.
SWB contends that the trial court erroneously imposed liability under La. C.C. art. 667.
SWB relies on the Louisiana Supreme Court's holding in Suire v. Lafayette CityParish Consol. Government[2], 04-1459, 04-1460, 04-1466 (La.4/12/05), 907 So.2d 37, wherein the court held that installation of metal sheeting by use of a back-hoe is not "pile driving" within the meaning of La.C.C. art. 667[3], noting:
The work the defendants performed in this case is not pile driving as that term is understood in the construction industry. The defendants have demonstrated that the material "driven" in this case, thin metal sheets, and the equipment used, a backhoe, differed from the materials and equipment involved in conventional pile driving. Suire at p. 15, 907 So.2d at 50.
The Supreme Court relied on the testimony of the project superintendent, Mike Moore, describing the equipment that would be used in timber pile driving and in sheet pile driving:
[In the case of timber pile driving] Oh, you would have a crane with a hundred-foot boom, a big old heavy set of leads, you would have an air hammer, you would have an air compressor half the size of this room to drivedrive the air . . . but we didn't have that on this job.
* * *
[A] sheeting is like a sliver, it justthere's not much vibration because it justit's like it just slivers on the ground, where a pile you've got something two foot round and you're beating it to go in a pile. The ground up-heaves, it's gotyou know, you put a piling in one spot, you've got mud displaced and it's got to go somewhere. But with the sheeting that's why a sheeting is done, is because it's real thin and it just slides in the mud; there's not much vibration.
Suire at p. 14, 907 So.2d at 49-50.
The Supreme Court noted that the superintendent "maintained throughout his deposition testimony that no pile driving was performed in the Belle Terre Coulee project", and distinguished the potential vibration caused by installing metal sheeting as compared to that caused by conventional pile driving.
In the instant case, however, there was evidence that both timber and sheet piling were involved in the Project. Furthermore, while the sheet piles in Suire were merely pushed into the ground with a backhoe, the sheet pile installation in the case at bar was performed by pounding the sheets with a vibratory pile-driving hammer. The Suire court was clearly influenced by the fact that a backhoe is not the type of equipment traditionally associated with pile driving. As Mr. Moore testified in that case, equipment that is traditionally associated with pile driving includes large cranes and vibratory hammers. Such heavy equipment was used on the Napoleon Avenue project, where, according to the testimony of Joel Morrow, James's project supervisor, and the vibration monitoring reports submitted by Citywide Testing & Inspections, Inc., the sheet piles were driven with 70-ton cranes and *70 vibratory hammers. It is this type of equipment, and the potential for damage that it poses, that underlies La.C.C. art. 667's "ultrahazardous" designation for pile driving operations. Citywide's reports indicate that the pounding of sheet piling in connection with the Napoleon Avenue project generated vibrations as great or greater than those associated with the timber pile driving. According to Plaintiff's Exhibit P-585, these highest levels of vibration would have been caused by the crane movement regardless of whether the pile driving involved sheet piles or timber piles.
The trial court noted that regardless of whether SWB can be held liable under a theory of absolute liability, it is liable under La.C.C. art. 667 because it knew or should have known that the Project would likely result in damage to neighboring properties, but failed to take adequate steps to prevent that foreseeable damage. In a 1984 study performed by Eustis Engineering for SWB and the City of New Orleans, SWB was advised of the manner in which certain types of construction activity, including dewatering, can cause or affect settlement rates.
La.C.C. art. 667 provides that a proprietor can be liable for damage caused by improvement to his property if he knew or should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. The trial court found that such was the case as to the homes of each of these plaintiffs.
The trial court refers to the 1984 Eustis study and the opinion of this Court in Mossy Motors, Inc. v. Sewerage and Water Bd. of City of New Orleans, 98-0495 (La.App. 4 Cir. 5/12/99), 753 So.2d 269, recognizing the damaging effect of dewatering as support for its finding of actual knowledge on the part of SWB. Furthermore, ACOE wrote to SWB on February 25, 2000 advising that construction activities, including water-table draw-down from dewatering, heavy equipment movement and vibrations from driving and pulling sheet pile could result in damage to adjacent properties. Mr. Sullivan testified that when he received this letter, he had no reason to disagree with ACOE's statements or opinion. Mr. Sullivan testified that SWB monitored the Project to determine the extent of the impact of construction activities on neighboring properties and went so far as to obtain pre-construction photographs to document the level of anticipated damage.
The record supports the trial court's finding that despite the anticipation of property damage, SWB proceeded with the Project without changing its construction methodology. It did not exercise its option under the Agreement with ACOE to request betterments because, according to Mr. Sullivan, those "betterments" would have been at SWB's expense. The trial court found, and we find, no evidence in the record to indicate that SWB exercised its right of comment under the Agreement with ACOE to request alteration of the dewatering program to ameliorate damage to neighboring property from water table draw-down. The trial court found that SWB made a conscious decision to proceed with the Project without change, having balanced the cost of correction against the risk of damage to the neighbors.
Mr. Sullivan testified that SWB relied on its monitoring program to fulfill its duty to the neighbors; however, when that monitoring revealed that construction activities were causing what the trial court referred to as "profound impact well beyond the limits of construction," SWB did nothing to correct the problem.
*71 The trial court found that as early as August 16, 2000, Eustis, in its capacity as Brown's geotechnical engineering firm, advised SWB that the dewatering operations were drawing down water levels far outside the limits of construction, the same condition for which SWB had been held liable in the Mossy case. Thereafter, and continuing throughout the Project's term, SWB received monthly reports of dewatering-caused soil settlement outside the limits of the construction. SWB offered no evidence at trial that it responded to this information either by attempting to arrest the condition or to minimize the effects of the dewatering. The trial court concluded that by electing not to request betterments, for which it would have to pay, SWB gambled on the amount of damage that might be sustained by the plaintiffs.
In April, 2001, prior to commencement of the Phase 2 dewatering, SWB had received numerous complaints of property damage caused by its construction activities from Napoleon Avenue residents, including complaints from the Ferans. Their home had split down the middle because of settlement. Nonetheless, SWB did not request any changes in the dewatering program.
Mr. Morrow testified that he wrote to ACOE on October 29, 2001 expressing concerns about the possibility that dewatering might be having a damaging impact on adjacent properties outside of the limits of construction. This testimony is evidence that while SWB had been aware of problems for over a year, it had not communicated this information to contractors such as Brown.
Furthermore, even after having received complaints from neighbors of actual damage, SWB did nothing to request any changes to the Project, as it had a right to do under the Agreement with ACOE.
There is no basis in the record for SWB's contention that the damages of which the plaintiffs complain were caused by third party negligence. The record is devoid of evidence of such third party negligence. There is clear support for the trial court's finding that SWB was aware of the potential for damage from its construction activities, that it monitored those activities with that potential in mind, and did nothing to remediate the damages of which it was made aware well before the commencement of Phase 2 of the dewatering process.
For the foregoing reasons, we find that the record supports the trial court's finding of liability on SWB's part under both the absolute liability and negligence provisions of La.C.C. art. 667, and that the trial court's imposition of liability under these theories is not manifestly erroneous.
SWB contends that the trial court erroneously admitted and relied on the testimony of Daniel Heyer.
Trial courts are required to exercise a gate keeping function, including a careful analysis of the methodology employed by a proffered expert. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Foret, 628 So.2d 1116 (La. 1993). SWB introduced standards from two publications of the American Society of Civil Engineers, "Guidelines for Failure Investigation" and "Guidelines for Forensic Engineering Practice." It contends that Mr. Heyer did not follow these standards or consider data concerning vibration and dewatering generated by the Project. SWB's expert, having considered this data and applied several peer-reviewed computational formulae, determined that the Project could not have caused differential settlement in excess of 1/16th of an inch, too little to have caused the plaintiffs' damage. Its forensic engineer, *72 Leonard Quick, determined likewise that construction vibration could not have caused damage. SWB claims that Mr. Heyer did not consider actual vibration records and admitted he did not know how to perform a rate of attenuation curve analysis, a peer-reviewed formula for determining the amount of energy that can be expected at a given distance from the source of vibration.
Mr. Quick testified that the lack of a correlation between the progress of construction and actual settlement refuted Mr. Heyer's causation theory. Mr. Quick also performed elevation surveys of the plaintiffs' homes and determined that the elevations showed a tilt away from the excavation site, the opposite of the tilt that Mr. Quick testified would be expected if the tilt had been caused by the excavation.
SWB contends that the plaintiffs' evidence consists of "isolated data" and fails to correlate this data with the overall settlement in the Broadmoor area during this time.
In its reasons for judgment, the trial court noted acceptance of Mr. Heyer as an expert in the field of forensic engineering. The court accepted his testimony that dewatering in connection with the Project was a substantial contributing cause of damage to all three homes. Additionally, he testified that pile driving in connection with the Project was a substantial contributing cause of the damage to the Feran and Galan homes. The trial judge found, and we agree, that the evidence of record supports Mr. Heyer's opinions.
The trial court reviewed Mr. Heyer's methodology in its reasons for judgment:
Heyer testified that when conducting an investigation into whether construction activities have caused damage, experts in his field commonly begin by comparing homes at varying distances from the construction activities to determine whether homes closer to the construction have experienced unusual damage when compared with those farther away from the actual work. Heyer performed such an investigation in this case. In homes fronting on (like the Ferans' and Dr. Galan's homes) and in those closer to the Napoleon Avenue project (like the Holzenthals' home), Heyer observed the types of damage an engineer expects to see in connection with the type of construction activities involved. Heyer testified that the degree of such observed damage decreased with distance from the construction project (i.e. the farther you travel from the mid-line of the Napoleon Avenue neutral ground, the less damage you see, even in homes of the same age and construction). This observation led Heyer to conclude that the drainage construction project likely caused the damage to the plaintiffs' homes.
During the Daubert hearing, Mr. Heyer testified that forensic engineers employ engineering principles and observation of damage to determine whether damages to a structure are causally related to a given event. The methodologies used by forensic engineers, according to Mr. Heyer, include careful observation of damage to the subject and surrounding structures, in order to determine whether the damage is consistent with the suspect phenomenon. While SWB expert Mr. Quick opined that reliable forensic engineering opinion could not be rendered without conducting a more costly analysis of various empirical data, he admitted that he, himself, routinely relied on the methodologies employed by Mr. Heyer in reaching conclusions as to causation issues. Indeed, Mr. Quick rendered a causation opinion concerning Dr. Galan's home without having considered this type of data.
*73 Prior to becoming SWB's expert, Mr. Quick, acting for an insurer, rendered a causation opinion with respect to Dr. Galan's home based solely on his inspection, and without having reviewed any of the material that he testified at the Daubert hearing were necessary. Neither did Mr. Quick review the materials upon which Mr. Heyer relied in forming his opinion. Nonetheless, his report is stamped with the professional engineering seal, indicating that he used reliable, accepted, professional forensic engineering methodology in issuing the report. According to Mr. Quick's report, his analysis of the effect of vibration at Dr. Galan's home was based upon "site inspection and photographic documentation of the reported and observed damage, and analysis of the forensic physical evidence and damage profiles performed on October 31, 2001, and other documents, but not vibration monitoring data for the Project". Mr. Quick admitted that it was not necessary to review vibration monitoring data to reach an engineering conclusion as to whether there was vibration damage to the home.
It appears that the data SWB believes Mr. Heyer should have reviewed prior to having given his deposition, such as the project specifications and Project monitoring data, were unavailable to Mr. Heyer pursuant to an in limine ruling of the trial court. Mr. Heyer testified that after his deposition was taken, he reviewed all of the material viewed by Mr. Quick. Had that review undermined his opinions as to causation, he would have been responsible, as a professional forensic engineer, to offer a different opinion at the trial.
At the conclusion of the Daubert hearing, the trial court found that Mr. Heyer's methodologies were reasonable. In oral reasons, the court noted:
The Court finds it interesting that notwithstanding the specific elements deemed necessary by Mr. Quick, that he testified that this protocol could and would be tailored to the specific request made by the party requesting the report. It is my opinion that if the methodology to be applied can be and is varied by the defendant's expert, then there is no rigid standard toward which the defendant can hold Mr. Heyer.
Additionally, Mr. Heyer has testified that although the items outlined by Mr. Quick would have been helpful to him in compiling his report, they in no way prevented him from employing his 30 years' [sic] of experience as a civil engineer and physical findings at the inspection.
The Court finds that Mr. Heyer's methodologies were reasonable. Mr. Quick also testified that he has used his experience in the same manner when called upon to render reports.
Finally, the Court finds that the methodology he employed in this case does meet the Daubert standard, and the defendant's Motion in Limine is denied.
In support of its position, SWB cites Millican v. River Road Const., Inc., 05-485 (La.App. 5 Cir. 2/3/06), 924 So.2d 255. In that case, the court reviewed a trial court's summary judgment. The issue did not relate to the qualification or methodology used by an expert, but rather to the fact that, in that case, in the face of empirical data offered by the defense, the plaintiff's expert did not offer an opinion that the defendant's activities actually caused the plaintiff's damage. In the absence of such causation evidence, the Fifth Circuit affirmed the trial court's summary judgment in favor of the defendants.
The trial court is vested with wide discretion in determining who should or should not be allowed to testify as an expert and its rulings should not be reversed *74 in the absence of clear error. Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 8 (La.1/29/96), 666 So.2d 1073, 1079. This discretion is even greater in a bench trial. See Johnson v. Melton, 03-1132, pp. 5-7 (La.App. 4 Cir. 2/4/04), 867 So.2d 804, 808-809, citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). Our review of the transcript of the Daubert hearing convinces us that the trial court's decision to accept Mr. Heyer's expert opinion as to causation is within its wide discretion.
SWB contends that the trial court erroneously awarded damages in the absence of evidence linking specific items of damage to the Project.
All plaintiffs claim damage to their homes as a result of the dewatering, timber and sheet pile driving, and use of heavy equipment. The Ferans and Dr. Galan likewise claim damage to items of personal property, furniture and artwork which the trial court found was caused by dust intrusion from the construction activities and vibration. All plaintiffs claim to have suffered emotional distress from watching and experiencing the physical damage to their homes and from the manner in which SWB handled their claims.
The Louisiana Supreme Court noted in Chambers, supra, 595 So.2d at 602:
There can be little doubt that one aim of Article I, § 4, of our state constitution in requiring that the owner shall be compensated for property "taken or damaged . . . to the full extent of his loss" was to assure that the state and its subdivisions compensate owners for any taking or damaging of their rights with respect to things as well as for any taking or damaging of the objects of those rights. . . . The history of Section 4 reveals a desire to increase the level and scope of compensation beyond that provided by pre-existing state law. . . . (the purpose of the additional language in Article I, § 4 was to compensate an owner for any loss sustained by reason of the taking, and not merely restricted as under the former constitution to the market value of the property taken and to reduction in the market value of the remainder.)
Initially, we note that the trial court's conclusion concerning causation rests upon the court's decision to accept the testimony of the plaintiffs' expert, Mr. Heyer, and to reject that offered by the SWB expert, Mr. Quick. As to the latter, the trial court held:
Quick's testimony lacks credibility, and this Court should not rely on his opinions in forming the Court's Judgment. Quick admitted under cross examination that he ignored the conclusions regarding water table draw-down reached by geotechnical engineers retained in connection with the project, opting instead to conduct his own analysis, even thought he is not a geotechnical engineer. [FN 44: "Tellingly, the Board's counsel did not ask Boutwell, the geotechnical engineer the Board called to testify about vibration-induced settlement, to testify on issues of dewatering, even though Boutwell testified that he was qualified to render geotechnical opinions on this issue."] Additionally, Quick ignored monitoring data that contradicted and disproved his theoretical analysis with respect to vibration impacts. He testified that his opinions were based largely upon survey data, which in many instances contradicted the opinions he rendered. [FN 46: "For instance, Quick testified that a survey station near So. Claiborne Avenue, far from the construction activities, showed settlement roughly equivalent to that experienced at the plaintiffs' homes *75 when construction activities were nearest those homes. However, when viewed over the entire time span that dewatering was occurring in the vicinity of the plaintiffs' homes (May 2000 to November 2001), survey data for the So. Claiborne Avenue area station reveals that area experienced less than half of the settlement experienced at the survey points nearest the plaintiffs' homes. Moreover, Quick conveniently omitted the fact that in the two-month period after dewatering began in front of the Galan home (July 2001 to September 2001), the survey point in front of the Galan home experienced more than 7 inches of settlement, while the greatest settlement experienced at any of the eight settlement points at the So. Claiborne Avenue end of the project was only half an inch. See Exhibit P-1097, table 1.] Finally, Quick testified that he was not aware of, and did not consider, the fact that the accuracy of this survey data had been called into question, even though records of the engineering firm (that he claims he reviewed) did just that."
We find no error in the trial court's decision to accept Mr. Heyer's expert testimony and to reject that of Mr. Quick. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
The trial court conducted an extensive analysis of the causation evidence adduced at trial. The court noted that, in addition to Mr. Heyer's testimony concerning causation, there was independent evidence proving that the Project caused the plaintiffs' damages. Analysis of the dewatering monitoring data and business records of Eustis Engineering confirm Mr. Heyer's opinions. Analysis of ground-water monitoring undertaken at SWB's request confirms that within a month of the commencement of Phase 1 dewatering, monitoring wells as far as two blocks away from the dewatering activities experienced construction-induced draw-down of 1.5 to 3.5 feet. A May 8, 2002 letter from Eustis's geotechnical engineer Thomas Stremlau confirmed that Eustis referred to actual draw-down capable of causing settlement. During Phase 1, Eustis advised SWB that most of the monitoring wells along Napoleon Avenue had experienced construction-induced draw-down. The court noted that although Mr. Quick related these low well readings to lack of rainfall or lower river states, his finding was incorrect, as it was contradicted by Eustis and by the fact that dramatic drops in pressure were observed contemporaneously with initiation of dewatering at times when both rainfall and river stages were elevated.
The court noted that monitoring outside of the excavation site continued to reveal depressed water levels, and maximum draw-down levels were experienced at the wells closest to the Holzenthal and Feran homes, where draw-down reached five and a half feet.
Even more than a year after the construction activities had passed by the plaintiffs' homes, the December 2002 monitoring report shows that wells nearest the plaintiffs' homes continued to show draw-down of between two and four feet below pre-construction levels. Mr. Heyer testified that the homes would continue to experience settlement damage as long as the water levels remained depressed.
The trial court concluded, based on the monitoring data, that dewatering lowered the water levels under all three homes at issue to a sufficient degree to cause the settlement damage Mr. Heyer observed. The Feran home is located between two wells, P-0-D and P-4-D, that showed significant draw-down as a result of construction activities nearly a year prior to the *76 first photograph showing new settlement damage down the middle of the Feran home. Monitoring well P-1-D, the nearest well to the Galan home, showed significant construction-induced draw-down when the construction was still two blocks from the home. Although there was no monitoring well near the Holzenthal home, observations at wells P-1-D and P-4-D, taken when construction was one and a half to two and a half blocks away confirms that dewatering caused significant draw-down at the Holzenthal home, which is only a block away from dewatering activities at the Y intersection.
We find the evidence supports the trial court's conclusion that all three homes experienced draw-down as a result of the Project's dewatering of a sufficient degree to cause the significant settlement damage observed and documented by Mr. Heyer.
Likewise, the record supports the trial court's conclusions with respect to vibration damage to the plaintiffs' homes. Both Mr. Heyer and Gordon Boutwell, SWB's expert, testified that vibrations from pile driving can cause soil consolidation in the saturated stratum III sand layer, which consolidation could result in settlement damage.
The experts diverged in their assessment of the relevant vibration intensities. Mr. Heyer opined that vibration levels as low as 0.10 ppv[4] could cause damage. The monitoring reports showed levels in excess of that level at the Feran and Galan homes. Mr. Boutwell testified that the vibration intensities at those homes was insufficient to cause significant damage. This opinion, however, was based on data provided to Mr. Boutwell by Mr. Quick, which the trial court rejected. Apparently, Mr. Quick ignored multiple actual records of vibration levels in excess of those generated by his theoretical model, characterizing the records as "unreliable." Mr. Boutwell testified that authoritative engineering studies confirmed that construction-induced vibration could cause damage to older structures at levels as low as 0.12 or between 0.1 ppv and 0.5 ppv. A monitor at the Galan home's foundation recorded vibration of 0.59 inches per second when piles were being driven seventy-five feet away. The Feran home showed a reading of 2.0 ppv and other readings in the area between 0.25 ppv and 1.35 ppv. Mr. Quick had eliminated these readings from the material he gave to Mr. Boutwell and on which Mr. Boutwell based his opinion.[5]
SWB contends that certain elements of damage were not proved to a legal certainty, and that the plaintiffs did not show affirmatively that the damages were directly attributable to the defendant's activities, citing American Cas. Company v. Aetna Cas. and Sur. Company, 162 So.2d 811, 812 (La.App. 4th Cir.1964). Of course, as findings of fact, the trial court's decision to include various observed damage to the homes within the ambit of SWB's responsibility will not be disturbed in the absence of manifest error. See, Rosell v. ESCO, supra.
As noted hereinabove, our Constitution requires that a person whose property is taken or damaged for a public purpose is entitled to be compensated fully for his loss. Similarly, La.C.C. art. 667 provides for compensation to the extent of the cost to restore damaged property.
SWB contends that Richard Hood, the plaintiffs' damage adjuster, "merely *77 tallied up a total for every item of damage that he observed in these homes, regardless of the cost, and whether it was related to the Project or not." It claims that Mr. Hood's estimates are excessive and not based on a causal link between damage and the Project.
Not only did the trial judge observe and listen to the plaintiffs[6], their adjuster, and SWB's estimator, Mr. Winston Wood, but she also visited the three homes in question. The plaintiffs testified to their personal reasons for intending to repair their homes, and the trial court found that the plaintiffs' truthfulness and credibility were not challenged. The trier of fact found that the plaintiffs met their burden of showing that they are entitled to the full cost of repairs to their homes, without respect to the homes' market values.
Plaintiffs' damage expert, Richard Hood, of A.C.M.S., Inc. was accepted by the Court as an expert in property damage loss appraisal and estimating costs of repair. The court found reasonable his estimates of $379,805.36 to repair the Holzenthal home; $330,983.14 to repair the Galan home; and $246,936.10 to repair the Feran home. The trial court also noted that the Ferans have incurred out-of-pocket repair costs in the amount of $2,345 for temporary bracing to the roof structure to prevent its collapse.
The evidence of W.D. Scott, a local mold investigation and remediation expert, testified without contradiction as to his inspection of the homes. While the Feran home was fortunately free of mold, he found mold at the Galan and Holzenthal homes.
The estimates of moving expenses were provides by Donald Hug of United Van Lines, Paulk's Moving and Storage, Inc. These estimates were $15,825 for the Holzenthal movables; $12,500 for the Galan movables and $18,650 for the Feran movables. SWB alleges that these expenses are not necessary, but does not question the amounts testified to by Mr. Hug. Mr. Wood admitted that moving expenses can be an element of repair costs, but opined that the plaintiffs' furnishings can be moved from room to room as the repair work is done, and that these elderly plaintiffs should be required to remain in their homes during the repair process. Since the estimates reflect tearing out and replacing walls and ceilings, painting and shoring the homes, it is clearly unreasonable to require the plaintiffs to place their belongings at risk of further damage and to remain in the dust and fume-ridden homes during these repairs. The trial court properly rejected Mr. Wood's opinion in this respect.
The record supports the trial court's finding that the homes suffered severe damage as a result of the Project. The plaintiffs testified candidly that, like most homes of similar construction and vintage in New Orleans, their walls had some hairline cracks prior to the Project; however, they testified that these small cracks had been tolerable, manageable and capable of repair during routine painting. Once the Project began, many new, more severe cracks developed and the older, smaller cracks worsened to an intolerable degree. The Feran home suffered severe structural damage, in effect cracking from the roof to the ground. Dr. Galan's porch collapsed. All three houses will require significant repairs, including shoring and leveling. It seems unreasonable and could result in greater cost to require repairs to be made on any given wall only to the new cracks, leaving any old hairline cracks that *78 may not have been exacerbated by the Project.
Indeed, the trial court rejected SWB's argument that a crack-by-crack assessment should be made, finding such an analysis to be "neither feasible nor reasonably calculated to compensate the plaintiffs for their loss." The trial court held:
First, some of the damage consists of pre-existing cracks that were substantially aggravated by the project. It is impossible for this Court, looking at pre-construction and post-construction photos taken in differing lights, under differing conditions, with different cameras, to determine the degree of exacerbation of those cracks and make any sort of reasonable assessment as to which ones require repair as a result of construction. [FN83: "Furthermore, it is unclear from Calvin Folse [SWB's photographer]'s testimony whether certain construction activities, particularly the placement of heavy equipment, took place prior to the taking of the pre-construction photographs. Conveniently, the Board never offered any evidence to clarify this confusion.] Second, and more importantly, in order to repair the damage caused by the project, practically all of the walls and ceilings of the plaintiffs' homes have to be repaired, regardless of whether certain cracks in those walls pre-existed the construction damage.
To repair the settlement damage to these three homes, the homes will first have to be shored and leveled. This shoring process, necessitated by the Board's construction activities, will more likely than not cause new cracks. So walls that are not already cracked from the construction project will likely become cracked from the shoring work, which is needed to correct the settlement problems caused by the project's dewatering and vibration. . . . Since shoring is a necessary element of the repairs to these homes, and since shoring will necessitate repairs not currently evident, an estimation of damage solely on the basis of currently existing cracks will not adequately compensate the plaintiffs."
The trial court correctly rejected Mr. Wood's estimates, as they were based on the same crack-by-crack analysis the court found to be inappropriate where pre-construction photographs were either unavailable in the case of the Holzenthal home or unreliable as in the case of the Feran and Galan homes, and where shoring and leveling would more likely than not result in additional cracking of the walls and ceilings. Furthermore, Mr. Wood, at Mr. Quick's direction, did not include estimates for those elements of damage that Mr. Quick believed were not caused by the Project. As to those elements, Mr. Hood's evidence is uncontroverted.
The worst examples of settlement induced damage were not present in the pre-construction photos that SWB had taken of the Feran and Galan homes[7]. These photographs confirm that the major damage necessitating the extensive repairs to the homes did not exist prior to the Project. The trial court found that the SWB photographs taken before the actual dewatering at the location of the Feran and Galan homes were not reliable. The court noted that the photographs were taken after some heavy equipment had been moved into the neighborhood and after nearby monitoring wells began to reflect draw-down. Furthermore, some of the same cracks photographed pre-construction by SWB's agent actually appear to be worse than the same cracks post construction, an *79 anomaly that the trial court felt could have been the result of the pre-construction photographs' having been taken by specialists in the documentation of such damage for the purpose of high-lighting the damage.
The trial court accepted Mr. Hood's testimony that the severe crack down the middle of the Feran home and the partial collapse of Dr. Galan's porch, neither of which appear in pre-construction photographs, would have necessitated the same cost of repairs even had other items of damage pre-existed the project.
SWB seeks to limit the repairs to those items observed by Mr. Heyer in his report. However, the trial court noted that she was aware from Mr. Heyer's testimony that he was not retained, and did not undertake, to analyze or identify every single item of damage caused by the Project. Mr. Heyer's report addressed the condition of the plaintiffs' homes and the scope of the Project to determine whether the Project caused damage to the homes. His analysis was undertaken in order to determine generally whether the homes had suffered settlement damage as a result of the Project. He obtained a sufficient but not exhaustive number of samples and concluded that the damage had, in fact, occurred. At no time did Mr. Heyer suggest that his report was a definitive tabulation of all construction-induced damage to the property.
SWB also claims that the awards are excessive because they exceed the appraised values of the homes. This ignores the fact that the appraisals were "as is" appraisals made after the construction damage had been inflicted on the homes. As such, the appraisals are not relevant. Furthermore, because of the personal attachment that the homeowners have to their long-term residences, they are entitled to the full repair, since that cost, while perhaps disproportionate to the underlying value of the homes, is not exorbitant. See Roman Catholic Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874, 879-880 (La. 1993).
SWB contends that this Court should reverse the trial court's awards for emotional distress as excessive and for damage to personal property for lack of evidence. We find nothing in the record to indicate that the awards of $15,000 to Mr. and to Mrs. Holzenthal, of $25,000 to Dr. Galan and of $25,000 each to Mr. and Mrs. Feran are beyond the "great, even vast" discretion of a trier of fact in fixing such damage awards. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). See also Williams v. City of Baton Rouge, 98-1981, 98-2024 (La.4/13/99), 731 So.2d 240, noting in 1999 an award range of up to $35,000 for mental anguish damages associated with property damage, and Ard v. Samedan Oil Corp., 483 So.2d 925 (La. 1986).
In Louisiana, an award for mental anguish resulting from property damage is permissible in limited situations: (1) when property is damaged by an intentional or illegal act; (2) when property is damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) when property is damaged by acts constituting a continuing nuisance; or (4) when property is damaged when the owner is either present or nearby and suffered a psychic trauma as a direct result. Blache v. Jones, 521 So.2d 530, 531 (La.App. 4th Cir.1988). Clearly, the instant case qualifies under subsections (1), (2) and (3). The trial court observed the testimony of the plaintiffs and found that the plaintiffs were credible witnesses. They were elderly and had resided in their homes for many years, and felt helpless as they endured months of *80 watching their homes sustain increasing damage. Dr. Galan and the Ferans also lost personal property. The court found that they will also suffer future distress when they undergo the always stressful renovation process. Applying the Youn standard of review, we find that the trial court's awards of $15,000 each to Mr. and Mrs. Holzenthal, and of $25,000 each to Mr. and Mrs. Feran and to Dr. Galan, must be affirmed.
SWB contends that the trial court erred in awarding damages for timber pile shoring based on hearsay evidence.
The trial court awarded the Holzenthals $105,900, Dr. Galan $139,000 and the Ferans $107,300 for timber pile shoring, although the homes were not shored on timber piles prior to having been damaged by the Project. At trial, SWB objected that timber pile shoring would constitute a "betterment" to which the plaintiffs were not entitled. This Court rejected a similar argument in the Mossy Motors case. Mr. Allan Shepherd of Davie Shoring Company testified that current building codes exceed the requirements in place when the homes originally were constructed. Clearly, the plaintiffs are entitled to the full cost of repair to current standards, even if such construction would be an improvement over the original condition of the building. Mossy Motors, Inc., supra at pp. 15-16, 753 So.2d at 278-79.
In this appeal, SWB now argues that the evidence establishing the cost of timber pile shoring was inadmissible hearsay. The shoring estimates were prepared by Frank Harris, a former employee of Davie Shoring.[8] In the absence of Mr. Harris, Davie Shoring's estimator, Mr. Shepherd, visited the homes, and verified the information in the Harris report with measurements and verified the elevations of the homes to determine if the scope of the piling location was the same. Mr. Shepherd testified that were he asked to estimate foundation work at these homes today, he would employ the same methodology. We find no error in the trial court's ruling allowing Mr. Shepherd to testify in lieu of the unavailable witness and finding no prejudice to SWB.
The trial court gave oral reasons for judgment and findings of fact on April 25, 2005 with respect to the third-party defendants' Motions to Dismiss. The motions were considered ad seriatim.
SWB contends that the trial court erroneously dismissed James in the face of a prima facie case that James violated Project specification and acted improperly, causing the plaintiffs' damages.
As to James, the trial court found that, unlike some of the other third party defendants, James had no contractual relationship with SWB. Its contract was with ACOE only. There is no testimonial or other evidence to show that James did not perform its duties in accordance with the plans and specifications outlined in its contract with ACOE. While SWB has argued that at some points during the construction, vibration monitoring records indicated that James exceeded allowable vibration limits, there is no evidence as to when the limits were exceeded or that James was notified or failed to take necessary action to remedy the situation.
As a matter of law, a contractor on a state or federal project who complies with the project's plans and specifications is not liable for damages to the property of *81 third parties. Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940); La.R.S. 9:2771. In order to avoid involuntary dismissal of its third party demand against James, SWB had the burden of establishing a prima facie case by a preponderance of the evidence. La.C.Civ.Pro. art. 1672 B. SWB did not produce evidence proving that it was more probable than not that James's alleged violations of ACOE's plans and specifications for the Project caused the plaintiffs' damages. On appeal, SWB claims that the design of temporary retaining structures could have prevented water table drawdown outside the construction limits. However, this claim was not asserted at trial, ACOE approved James's design for the structure and SWB has not shown that the design violated any specification.
Both Mr. Sullivan and Mr. Becker testified that they had no evidence that James did not comply with its contract with ACOE. Neither was there testimony or other evidence that James's specifications and plans with regard to the system to prevent de-watering were not in compliance with the ACOE contract.
SWB seems to make a res ipsa loquitor argument on appeal, that is, "if the Project was performed in accordance with the plans and specifications, damage to surrounding property owners would not have occurred". SWB relies on the testimony, transcribed at pages 190 and 198 of Volume 22, and at pages 13, 21 and 23 of the record, of its General Superintendent, Mr. Sullivan. His testimony at page 190 of Volume 22 does not relate to this issue.
At page 198, Mr. Sullivan testified, "And to be frank with you, I worked on a lot of construction projects, and I never anticipated damage if everything was done properly." That statement does not indicate that had the Project been performed in accordance with the plans and specifications, no damage could have occurred.
At page 13 of Volume 23, Mr. Sullivan was asked whether heavy equipment or movement within the construction right-of-way presented a potential for damage to neighboring structures. He replied, "I would not contribute [sic] that damage to near structures if they were working within the limits of the contract." Mr. Sullivan gave no basis for this opinion.
At page 21 of Volume 23, Mr. Sullivan did not address the issue of deviation from the plans and specifications.
At page 23 of Volume 23, Mr. Sullivan testified that he asked Brown to undertake monitoring for the Project, and that the purpose of the monitoring was to control damage from drawdown. There is no testimony that Brown failed to execute its monitoring responsibility.
Both Mr. Sullivan and Joseph Becker, SWB's Project engineer, acknowledged that they knew of no failure by James to comply with the ACOE plans and specifications. Mr. Quick also testified that the ACOE accepted James's work as having been performed in compliance with plans and specifications. SWB called no one from ACOE to support its claim of James's deviation from the contract.
SWB asserts that the vibration monitoring reports show that James violated the ACOE specifications. However, the ACOE specification on pile driving anticipated that the acceptable vibration level would be exceeded, and that damages caused by this anticipated excess vibration, as distinguished from negligently caused excess vibration, would be considered to be part of the Project's cost. There is no evidence that the excess vibrations caused by the pile driving were caused by James's negligence. The ACOE specifications with *82 respect to pile driving stated that when the limit was exceeded, as anticipated, the ACOE would notify James, who then would take measures to reduce the vibrations. There is no proof in the record that ACOE gave such a notice to James or that James failed to take necessary steps in response to such notice.
SWB contends that the "spikes" of vibration over the level set in the contract as the threshold for notice by the monitor to James constitutes a violation by James of the plans and specifications. This argument ignores the uncontroverted evidence of record that such "spikes" are unavoidable in the course of this type of construction. Furthermore, there is no evidence that James failed to act upon any warning from the monitor that vibration levels were approaching or exceeding the notification threshold.
For the foregoing reasons, we find that the trial court's judgment dismissing SWB's claim against James is not manifestly erroneous.
SWB contends that the trial court erroneously dismissed S & P in the face of a prima facie case that it acted improperly by failing to include in the contract bid specifications the requirement that construction not impact ground water outside the easement and by failing properly to discharge its monitoring duties.
As to S & P, the trial court found that it designed the box culvert and its duties included monitoring the daily construction activities, pursuant to its contract with SWB. The court held that S & P's contract was for professional services. Thus, it was incumbent upon SWB to establish a standard of care, S & P's breach of the standard, and that the breach caused the plaintiffs' damages. The court noted that neither of SWB's expert engineers established through their testimony the standard of care applicable to S & P or that S & P breached an applicable standard of care.
The trial court rejected SWB's contention that S & P's action in stamping the Project plans gave rise to liability. The trial judge accepted the testimony demonstrating that the stamp is indicative only of the preparation of the design and specification by S & P. With regard to the TRS system, the trial court accepted the uncontroverted testimony that ACOE designed the system and that this ACOE design was incorporated verbatim into the final design and specifications for the project.
The trial court rejected SWB's argument that S & P's letter of May 4, 1998 advising Brown of its concerns with regard to withdrawal of sheet pilings constitutes proof that S & P knew of problems, but failed to report them to SWB. The testimony of Mr. Sullivan, the SWB superintendent, revealed that the chain of command required S & P to report directly to Brown, and that the contract between SWB and S & P did not require S & P to report directly to SWB. The trial court noted that there is no testimony to establish that the concern expressed by S & P in the aforementioned correspondence caused damage to the plaintiffs.
While SWB argues that S & P violated the terms of its contract with SWB, we note from the record that SWB did not offer testimonial or other evidence that such a violation caused any damage to the plaintiffs.
The specifications governing the temporary retaining structure and the dewatering plan were prepared by ACOE, and not by S & P. Therefore, ACOE, and not S & P, is responsible to SWB for the adequacy of those specifications. S & P neither applied its professional seal to the specifications nor certified the adequacy of *83 ACOE's specifications. Because the ACOE specifications controlled, S & P cannot be held to have breached its contract with SWB. Likewise, S & P had no authority to and was expressly prohibited from altering ACOE's specifications. Furthermore, S & P did not have geotechnical responsibility for the design and evaluation of the sheet pile removal and its potential effect on neighboring property. It merely incorporated information provided by ACOE into the Project drawings.
In order to prevail against S & P, SWB had the burden of proving that S & P's professional engineering services were not performed with the same degree of skill and care exercised by others in the same profession in the same general area. Greenhouse v. C.F. Kenner Associates Ltd. Partnership, 98-0496, p. 7 (La.App. 4 Cir. 11/10/98), 723 So.2d 1004, 1008. SWB had the further burden of proving that S & P's alleged breach of this standard of care was the legal cause of the plaintiffs' damages.
The plaintiffs made no claim against S & P. Their expert engineer, Mr. Heyer, offered no testimony that S & P's professional services deviated from the standard applicable to engineers in the New Orleans area. SWB's engineering expert, Mr. Quick, was not asked and did not offer evidence of such deviation.
In the absence of such evidence, the trial court properly dismissed SWB's claims against S & P.
SWB contends that the trial court erroneously dismissed Brown in the face of a prima facie case that it failed to discharge its obligation to prevent damage from construction vibration, dewatering and settlement.
As to Brown and Continental Casualty, the trial court noted in its oral reasons for judgment and findings of fact that SWB had a professional services contract with Brown, like that with S & P, that was testified to by Mr. Sullivan and introduced as a joint exhibit. The trial court specifically rejected SWB's claim that Brown's services also included activities that do not fall under the category of professional services. As testified to by Mr. Joseph Becker, SWB's Project Engineer, Brown acted as an extension of SWB's engineering department, and all of the testimony and evidence demonstrated that Brown acted solely within the professional services contract. Because this is a professional service contract, SWB cannot recover unless it establishes the professional standard of care, proves that Brown breached that standard, and that the breach caused the plaintiffs' damages.
The trial court found that SWB presented no evidence of a standard of care, much less that Brown breached an applicable standard. We find no error in the trial court's conclusion.
Furthermore, there is no evidence that Brown initiated, directed, engaged in or performed any construction activities. Absent such evidence, the trier of fact could not draw a direct relationship or causal connection between the plaintiffs' damages and Brown's actions. Likewise, SWB's reliance on alleged inadequacies in the monitoring of vibration levels is inapplicable to Brown. Plaintiffs alleged, and the evidence proved, that it was the construction work and not the monitoring, that damaged their property. As Mr. Sullivan testified, the purpose of the monitoring program was to determine whether damage alleged to be caused by the Project was in fact caused by the Project. There is no evidence that the monitoring program was or should have been designed to eliminate the likelihood of damage to adjacent property. With or without monitoring, the *84 plaintiffs would have sustained the damage caused by the construction process.
SWB contends that the trial court erroneously found that Fidelity did not owe SWB a duty to provide a defense, and erroneously dismissed Fidelity, ignoring the separation of insureds clause in the Fidelity contract that provided a separate policy of insurance for SWB.
As to Fidelity, the trial court noted that Fidelity issued a general liability insurance policy to its insured, Brown, a copy of which was submitted jointly by the parties. The policy specifically excludes coverage for damages caused by rendition of professional services. Since Brown's sole relationship with the parties in this case was for provision of professional services, the policy exclusion applies to SWB's claim against Fidelity.
In order to determine whether an insurer owes a duty to defend a party, the court's analysis must be based upon the factual allegations contained within the four corners of the plaintiff's petition and the terms contained within the four corners of the insurance policy.
The Fidelity policy provides in pertinent part:
WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule [the SWB] as an insured but only with respect to liability arising out of your [Brown's] operations or premises owned by or rendered to you [Brown].
An insurer must provide a defense to an insured if, assuming all of the allegations of the petition to be true, there would be both coverage under the policy and liability to the plaintiff. American Home Assur. Company v. Czarniecki, 255 La. 251, 230 So.2d 253 (La.1969). Fidelity's policy provides that SWB would be an additional insured, but only with respect to liability arising out of Brown's operations. The plaintiffs' petitions are devoid of any allegations sufficient to inform Fidelity of the possibility that SWB could incur any liability to the plaintiffs arising out of Brown's operations. There is no allegation that SWB's liability to the plaintiffs comes through Brown, and no allegation that Brown was in any way negligent or failed to comply with its contractual obligations or the plans and specifications for the Project as they related to Brown. Absent such allegations, Fidelity has no obligation to defend SWB. None of the plaintiffs alleged any damages arising out of Brown's operations or premises owned by or rendered to Brown. Therefore, there can be no coverage for SWB as an additional insured under the policy.
SWB relies on Orleans Parish School Board v. Scheyd, Inc., 95-2653 (La.App. 4 Cir. 4/24/96), 673 So.2d 274 and Suire v. Lafayette City-Parish Consolidated Government, supra. In both of those cases, however, plaintiffs alleged bases for liability and named as defendants the named insureds. Those allegations of named insured liability triggered the duty to defend and are absent in the case at bar.
SWB argues that Fidelity's position would obviate any scenario under which coverage could be afforded to SWB as an additional insured. We note that the policy would provide coverage if, as in the jurisprudence cited by SWB in support of its position, a Brown employee injured on the job sued SWB for personal injury damages. In such a case, the damages would arise under Brown's operation, and coverage would likely be found.
Furthermore, the Fidelity policy, as a general liability policy, does not provide coverage for professional malpractice, the very claim on which SWB bases its third party demand against Brown.
*85 SWB characterizes some unspecified portion of Brown's work as non-professional liaison services. In that connection, it cites the Alabama Supreme court's opinion in United States Fidelity & Guaranty Company v. Armstrong, 479 So.2d 1164 (Ala.1985). The Alabama court found that administrative services did not come within the professional services exclusion and found coverage. SWB suggests that Brown has characterized itself as a liaison between SWB and unspecified "other parties", and claims the benefit of the Alabama decision.
In the case at bar, SWB did not established that Brown performed non-professional "liaison" services, or failed in their performance. While Ann Springston, Brown's engineer, noted that some sub-consultants Brown hired performed such services as public relations advice, and that Brown had administrative employees, she clearly testified that these non-professional employees did not perform Brown's responsibilities under the SWB contract. SWB has not directed us to and our independent review of the record reveals no evidence that its liability to the plaintiffs was related to any of the work performed by Brown's non-professional employees.
For the foregoing reasons, we find no error in the trial court's disposition of SWB's claims against Brown and Fidelity.
This is clearly a case in which a valid and vital public purpose, improved drainage of our city-below-sea-level, was served. The evidence clearly preponderates that the contractors on the Project performed in accordance with the plans and specifications provided by ACOE and SWB. Despite the best efforts of the SWB and ACOE and the contractors, dewatering and vibration damage to these neighboring interests was the natural consequence of the Project. Under the Avenal/Chambers analysis, this is a classic case of inverse condemnation and liability for foreseeable damage caused by ultrahazardous activities. As such, the case is appropriate for the trial court's dispositive judgment. Finding no manifest error in the trial court's judgments, we affirm the judgments in these consolidated appeals.
AFFIRMED.
TOBIAS, J., concurs in the result and assigns reasons.
TOBIAS, J., concurs in the result and assigns reasons.
I respectfully concur in the result.
As stated by the Louisiana Supreme Court in Avenal v. State, 03-3521 (La.10/19/04), 886 So.2d 1085:
We find it unnecessary to conduct the full [State Through Dept. of Transp. and Development v.] Chambers analysis, which seeks to determine whether a plaintiff is entitled to eminent domain compensation because his private property has been taken or damaged for public use. In this case, the relevant consideration is whether plaintiffs' property was "taken" for a public purpose, or whether it was "damaged" for a public purpose. A distinction between a taking and a damaging is necessary because of the existence of two relevant prescription statutes, La. R.S. 13:5111 and La. R.S. 9:5624. Section 5111 of Title 13 is entitled "Appropriation of property by state, parish, municipality or agencies thereof; attorney, engineering and appraisal fees; prescription" and provides in pertinent part: "[A] proceeding brought against the state of Louisiana . . . or other political subdivision . . ., for compensation for the taking of property by the defendant, other than through an expropriation proceeding, . . . shall prescribe three years from the date of such taking." Section 5624 of Title 9 provides: *86 "When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works." Thus, although the Louisiana Constitution provides that just compensation shall be paid when property is taken or damaged, La. R.S. 13:5111 provides a three-year prescriptive period for takings and La. R.S. 9:5624 provides a two-year prescriptive period for damage. A.K. Roy, Inc. v. Board of Commissioners for Pontchartrain Levee District, 237 La. 541, 547-48, 111 So.2d 765, 767 (1959) (Prescriptive period of La. R.S. 9:5624 applies only when private property is damaged for public purposes, but not actions for recovery of private property taken for public purposes).
The distinction between a taking and a damage claim was made in a case in which a holder of a predial lease invoked property rights pursuant to the 1921 Constitution. Columbia Gulf Transmission Co. v. Hoyt, 252 La. 921, 215 So.2d 114 (1968). In that case, the Court found the lessee's rights under a predial lease fell under the constitutional designation of "private property" in Art. I, § 2 of the 1921 Constitution and required just compensation to the lessee before the lease rights were damaged, even though Louisiana codal law classified a lessee's rights as personal rights. However, as particularly relevant to this case, the Court distinguished the terms "taken" and "damaged" in Art. I, § 2. The Court stated that "property is `taken' when the public authority acquires the right of ownership or one of its recognized dismemberments." 215 So.2d at 120. "Property is considered `damaged' when the action of the public authority results in the diminution of the value of the property." Id.

03-3521 at pp. 27-29, 886 So.2d at 1104-05.[1]
From the foregoing, it appears that the majority's analysis of the case at bar as one in inverse condemnation (appropriation) is incorrect; the case is one of damages subject to the provisions of La. R.S. 9:5624. The distinction between the two concepts is, in my view, immaterial in this case because the result is the same, to-wit, the plaintiffs suffered damages as a result of a public work.
With respect to the issue of damages, I cannot say that the majority erred in its awards. However, I reiterate my opinion, expressed in Grefer v. Alpha Technical, 02-1237, pp. 3-5 (La.App. 4 Cir. 3/31/05), 901 So.2d 1117, 1155-56 (Tobias, J., concurring on rehearing),[2]writ denied, 05-1590
*87 This Page Contains Footnotes. *88 (La.3/31/06), 925 So.2d 1248,[3] that there exists a tension between the Supreme Court cases of Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993) and Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686, which ought to be resolved by the Supreme Court. The case at bar presents a vehicle through which the Supreme Court might clarify the matter.
NOTES
[1] SWB apparently has abandoned its claim that plaintiffs must establish liability under La.C.C. art. 667 as a prerequisite to an action for inverse condemnation.
[2] This argument applies only to the Holzenthal plaintiffs, since both the Feran and Galan claims involve timber pile driving.
[3] SWB apparently has abandoned the argument it made in the trial court that it is not a "proprietor" within the meaning of La.C.C. art. 667.
[4] Peak Particle velocity (ppv) is a measure of vibration.
[5] It appears that SWB has abandoned its argument that the damages to the plaintiffs' homes were caused by drought.
[6] Mr. Feran was unable to testify at trial because of illness. The Court accepted his deposition testimony, which was read into the record.
[7] SWB did not have the Holzenthal home photographed pre-construction.
[8] The trial court found that SWB had not taken Mr. Harris's deposition while he was a Davie employee and was not prejudiced by the substitution of Mr. Shepherd's testimony for that of the unavailable Mr. Harris.
[1] For further amplification and discussion of the issue, see Avenal v. State, Dept. of Natural Resources, 01-0843, pp. 42-59 (La.App. 4 Cir. 10/15/03), 858 So.2d 697, 732-741 (Tobias, J., dissenting), rev'd. 03-3521 (La.10/19/04), 886 So.2d 1085.
[2] In pertinent part, my concurrence stated:

In our original opinion, we discussed at some length the cases of Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993) and Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686. However, we did not fully discuss the tension between them, which, in my view, makes the jury's determination of compensatory damages neither manifestly erroneous nor clearly wrong. In a supplemental application for rehearing, Exxon cites this court to Hornsby v. Bayou Jack Logging, 04-1297 (La.5/6/05), 902 So.2d 361 . . ., a case decided by the Supreme Court while Exxon's application for rehearing in this case was pending before this court.
Corbello is a contract case decided by the Louisiana Supreme Court after the appeal in the case at bar was docketed in this court. Roman Catholic Church is not a pure tort case. Underlying the recovery in Roman Catholic Church is the Church's contractual obligation to the U.S. Department of Housing and Urban Development ("HUD") that required the Church to operate the property for low-income individuals for a fixed period of time, in default of which ownership of the property would revert to HUD. Thus, I find that it is reasonable to read the two cases in pari materia. Whereas, the Grefers' claims against ITCO sound in both contract and tort, their claims against Exxon are in tort.
In Roman Catholic Church, at the time of suit the Church had already expended a very substantial sum to restore the property. In context, that was reasonable. In Corbello, the plaintiff had not expended anything, yet was allowed to recover $33 million without any obligation to spend anything to restore the damaged thing. As I read Corbello, where the restoration (remediation) is contractual the restoration costs may include apparently speculative costs without an obligation to expend the money to restore, but where the remediation costs are tort based, only actual sums expended can be considered.
If the Supreme Court in Corbello read out of the contract at issue therein the word "reasonably," how can we find an award of $56 million by the jury is unreasonable?
We found that the Grefers had "both personal and economic reasons for wanting to restore their property to its original condition." We reached this conclusion, relying upon Judge Grefer's statements that (a) "he and his siblings want to restore the property, which has been in the Grefer family since 1875, to its original condition and not to the mere minimum DEQ standard"; (b) he and his siblings were "unable to sell or lease the contaminated property without exposing themselves to liability and they do not want to burden their children with this"; and (c) he expressed "grave concern about the effects the radioactive contamination might have on the neighbors and the general public." A trier of fact has the right to weigh that testimony and give it such weight as deemed appropriate.
One might assert that Judge Grefer was framing his answers to questions propounded to come within the ambit of Roman Catholic Church's personal-to-the-owner test, ignoring the language in the case referring to the "homestead", i.e., one's personal dwelling (which is not the case of the Grefers). But again, this falls to the trier of fact to weigh and evaluate.
In my view, the Supreme Court's standards for recovery must be understood in the context of the whole body of the law respecting recovery of damages. Among these are the doctrine of waste and the reasonable person. How can we conclude in light of the damage award in Corbello ($33 million to remediate a property having a value of $108,000) that the $56 million award is unreasonable? One might argue that the Grefers will remediate the property down to levels that make it commercially viable and usable, i.e., levels within the guidelines of the Louisiana DEQ and/or levels that will satisfy a financial institution that it can safely lend money on the property without the exposure of having to remediate the property at substantial cost should the property come into the financial institution's ownership by virtue of foreclosure. But is that difference in dollars not a justified award? The plaintiffs will likely expend substantial sums in defense of third party claims and responding to any awards of damages.
Hornsby is distinguishable on its facts. The case addresses damages for the improper cutting of trees, where a special statute specified what damages were recoverable and the penalties associated therewith. In my view, a material difference exists between cutting of trees and contamination from radioactivity. A landowner can sell his property without trees on it, and the value of the land may be reduced because of the absence of the trees. However, land contaminated with radioactivity at a level which makes the land unmarketable or undevelopable because no financing entity will loan money thereon as discussed above, is something that is certainly very personal to the owner when the contamination is caused by a third person. Thus, Judge Grefer's testimony to the effect that he and his family are unable to sell or lease the contaminated property without exposing themselves to liability is something that comes within the ambit of something personal to the owner. Superimpose on this that, unlike Roman Catholic Church where the Church had the financial resources to repair the damage, the Grefers are apparently without the financial resources to remediate their property without first recovering the funds to do so. Is not the jury's determination in this case reasonably within their discretion?
[3] As of the date of the issuance of this opinion, the Grefer case is pending before the United States Supreme Court on application for a writ of certiorari. Exxon Mobil Corp. v. Grefer, no. 05A981, stay denied, ___ U.S. ___, 126 S.Ct. 2056, 164 L.Ed.2d 777.